SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ALBANY
------------------------------------------------------------
MIKE DIEDERICH JR., individually and
on behalf of the class of citizens and taxpayers
directly affected citizens of the
State of New York, JOSHUA DOE, JANNA DOE,
individually, and as representatives of
the class of all children similarly situated,

                          Plaintiffs,

                                                    **AMENDED**
                                                    **CITIZENS' COMPLAINT**

           against
                                                    **SU 2018-**

LETITIA JAMES, N.Y.S. ATTORNEY GENERAL-ELECT,
CHANCELLOR OF THE NYC DEPARTMENT OF
EDUCATION, SUPERINTENDENT OF SCHOOLS OF
the EAST RAMAPO CENTRAL SCHOOL DISTRICT,
AND SUPERINTENDENT OF THE KIRYAS JOEL
VILLAGE SCHOOL DISTRICT,
BILL DE BLASIO, New York City Mayor,
MARYELLEN ELIA, New York State
Commissioner of Education, BETTY ROSA,
Chancellor of the New York State Board of Regents
and THOMAS P. DINAPOLI., N.Y.S. Comptroller,
                          Defendants.
------------------------------------------------------------

        Plaintiff Mike Diederich, Jr., as a citizen and recent candidate for the Office of

N.Y.S. Attorney General of the State of New York, on behalf of himself and the other

plaintiffs herein, and especially children being denied their right to a sound secular

education in ultra-orthodox (Hasidic) yeshivas complains of the Defendants as follows:

### INTRODUCTORY STATEMENT

*Over 52,000 young Americans receive almost no basic secular education in the*
*Hasidic yeshivas of New York City, and similarly the Hasidic children in yeshivas*
*of Rockland and Orange County, NY. These children receive less education for a*
*working life after school than children received by their ancestors in 18th Century*
*Europe, as their ancestors learned life-supporting education that prepared them*
*for farming or a trade. In the 18th and 19th Centuries, Hasidic boys did not study*

religion 9 hours a day, yet this seems to be what the 21st Century Hasidic leaders want.

Presently, New York's Hasidic children are condemned to a future of poverty. The Hasidic community of New Square is the poorest municipality in the State. Another, Kiryas Joel, is close behind. This document describes many reported cases of Hasidic individuals defrauding the government, and the local, State and federal taxpayers. The intent here is not to brand Hasidics as thieves, as the vast majority are undoubtedly very moral, honest, God-fearing and peace-loving.

Rather, the focus of this complaint is the Hasidic leadership's destructive refusal to allow Hasidic children to receive the liberal, secular education that they need in order to 1) keep themselves and their future families self-sufficient and off the public dole, and just as importantly, 2) become educated and informed citizens, willing and able to participate in civic life, the defense of the Nation and its democracy.

Liberal secular education—of all Americans—is necessary for American democracy to survive, and for peace in the world. History proves this. It is required to prevent conflicts between groups of people (especially when one group is growing exponentially), whether land use in the suburbs or land use in Israel (where violence is occurring over ultra-Orthodox population-growth, land use issues and refusal of Hasidics to serve in Israel's military).

Liberal secular education is required by New York State law, and this is the reason for this lawsuit. It seeks for the Defendant governmental officials to perform their jobs for the sake of Hasidic children. It requests that the Court declare and enjoin the Defendant officials to act. It requests the Court to appoint one or more law guardians to investigate whether Hasidic children are being deprived of an adequate secular education, and if so, whether this rises to the level of "educational neglect" that can be prosecuted in the N.Y.S. Family Court. And it requests that N.Y.S. Comptroller Thomas DiNapoli cut off all State funds to any and all Hasidic yeshivas that are not providing a minimally acceptable secular education—the education that these children are entitled to and need, because their futures depend upon it.

## TABLE OF CONTENTS

Introductory Statement...................................................................................................... 1

Complaint Table of Contents............................................................................................. 2

Parties................................................................................................................................. 4

    A.    The "Classes" in Plaintiffs' requested Class Action ............................................ 6

    B.    Background and interest of Plaintiff Diederich.................................................... 7

    C.    Background and interest of Joshua Doe and Janna Doe Plaintiffs....................... 8

Hasidic children's constitutional right to an adequate education ................................... 9

    D.    Democracy needs secular education instructive on democracy, human behavior and civics ........................................................................................................................ 11

    E.    Judicial notice of Hasidic educational neglect and other abuse of children....... 12

2

F.    Evidence of Hasidic Children's Educational Neglect and Community-directed Deprivation of a Sound Secular Education—the "YAFFED" lawsuit ......................... 15

G.    The Power of "Block Voting".......................................................................... 33

H.    Exponential Population Growth of an Insular Group in an Otherwise Pluralistic Democracy ......................................................................................................... 34

I.    The Insular, Non-Self-Supporting Hasidic Community ......................................... 37

J.    Poor Education results in Poor municipalities and destitution ............................. 42

K.    The Radical, Insular Hasidic culture is a threat to liberal democracy............... 63

L.    Damages to the Hasidic children—monetized.................................................. 67

M.    Appoint a Law Guardian for Hasidic children ................................................ 68

FIRST CAUSE OF ACTION - Violation of Hasidic Children's Civil rights,  by Denying them the Equal Protection of the Law,  Including the Right to a basic secular Education, in violation of the U.S. and N.Y.S. Constitutions........................................................... 69

SECOND CAUSE OF ACTION - Violation of The equal protection  rights of Taxpayers Proximately affected by an Expanding Insular Religious Community ............................. 71

THIRD CAUSE OF ACTION - Depriving Children Their right to a secular education Imperils Republican Democracy Protected by the Guarantee Clause of the U.S. Constitution....................................................................................................... 74

A.    The Guarantee Clause envisions an educated citizenry ..................................... 74

B.    Hypothetical Vatican takeover of Kiryas Joel to form a "Roman Catholic town" –establishing religion and eliminating a republican form of govenment ................... 75

FOURTH CAUSE OF ACTION - Hasidic Children have no Ability to Petition Government for Redress, and thus the Court should  Ensure that their Interests are heard (their parents' or religious leaders' views notwithstanding)............................................. 77

FIFTH CAUSE OF ACTION - Hasidic Children are forced into "Separate Yet Unequal" Schools; suffer "involuntary Servitude;"  are Forced into a "Hasidic Ghetto"; Suffer Educational Neglect; and Suffer an Impaired ability to contract with the larger american Society, all in violation of the 13th and 14th Amendments and 42 U.S.C. §§  1981, 1983, 1985 & 1986 ....................................................................................................... 78

A.    Hasidic Yeshivas are "Separate and Unequal" ................................................ 78

B.    The Hasidic Yeshivas amount to Involuntary Servitude in the service of religious elders ...................................................................................................... 79

C.    Interference with Ability to Contract on Account of Race (being Jewish)........ 81

D.    The Hasidic Leadership conspires to deprive Hasidic Children of their constitutional rights, and refuses aid.......................................................................... 81

E.    Educational Neglect—also in violation of the children's equal protection, religious freedom and other federal rights ................................................................ 84

SIXTH CAUSE OF ACTION - The N.Y.S. DoE's New Guidance deprives current Hasidic Children of their right to a Basic Education ..................................................... 85

SEVENTH CAUSE OF ACTION - Ghettos are Anti-American,  and their creation violates the Establishment Clause................................................................................. 86

EIGHTH CAUSE OF ACTION - Hasidic Children are the Victims of Educational

3

Neglect, which neglect the Defendants must rectify ...................................................... 89

NINTH CAUSE OF ACTION - declaration and Injunctive Relief that AG-Elect James and the Other Defendants take appropriate measures to protect the Educational rights of the children of ultra-orthodox (Hasidic) parents ............................................................ 89

    A.    Hasidic Children have the right to a Sound Secular Education ......................... 90

    B.    "Hasidic Children's Lives Matter"—their education, their quality of life, their participation in the larger civil society and body politic, and their safety. ................... 91

    C.    The UN's Universal Declaration of Human Rights applies ............................... 91

TENTH CAUSE OF ACTION - request for declaratory and Injunctive relief that the Public school system Defendants protect the educational rights of the children of hasidic parents  in kings, rockland and orange counties ............................................................ 93

ELEVENTH THIRTEENTH CAUSE OF ACTION - request for declaratory and Injunctive Action against the Defendant State Officials, requiring that they investigate whether the Hasidic Leadership is engaged in a corrupt enterprise, in violation of RICO— the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. 1961 ....... 95

TWELFTH CAUSE OF ACTION - "Reverse Discrimination" against non-Hasidics .. 101

THIRTEENTH CAUSE OF ACTION - Declaration and Injunction Prohibiting N.Y.S. Comptroller from Disbursing State Funds for Unlawful purposes, namely, the funding of unlawful hasidic Yeshivas ............................................................................................ 103

FOURTEENTH CAUSE OF ACTION - Request for Intervention by AG-Elect James 104

CONCLUSION ......................................................................................................... 105

## PARTIES

1.    Plaintiff Michael "Mike" Diederich, Jr. is a resident and taxpayer of the Town of Stony Point, County of Rockland, State of New York, and this year was a candidate seeking the office of the Attorney General of the State of New York.  He suffers continuing damages, yet seeks only nominal damages for himself in this action, as he is prosecuting this lawsuit in the public interest.[1]

---

[1] Plaintiff Diederich's damages include, but are not limited to, financial loss through the Comptroller's unconstitutional disbursement of State funds to unlawful Hasidic yeshivas, and local taxing authorities expenditures as a result of Hasidic community-related illegalities described herein.  Thus, at a minimum, he has standing under § 123-a of the N.Y.S. Finance Law.

4

Case 1:19-cv-00035-BKS-CFH    Document 2    Filed 01/09/19    Page 5 of 105

2.     Plaintiff's Joshua Doe and Janna Doe, are fictitious names of children of Ultra-Orthodox (Hasidic) parents receiving a deficient secular education in the yeshivas they attend.

3.     Defendant Letitia James is the N.Y.S. Attorney General-elect, and is successor to Barbara Underwood, the esteemed Attorney General and former Solicitor General of the State of New York.  This lawsuit is against her solely in her official capacity.

4.     The Defendant Chancellor of the New York City public schools, upon information and belief, heads a public school system wherein are located private schools run by ultra-Orthodox (Hasidic) sects, and has the power and responsibility to supervise those private schools under the N.Y.S. Education Law.

5.     The Defendant Superintendent of the East Ramapo Central School District, upon information and belief, heads a public school district wherein are located private schools run by ultra-Orthodox (Hasidic) sects, and has the power and responsibility to supervise those private schools under the N.Y.S. Education Law..

6.     The Defendant Superintendent of the Kiryas Joel Village School District , upon information and belief, heads a public school district wherein are located private schools run by ultra-Orthodox Hasidic sects, and has the power and responsibility to supervise those private schools under the N.Y.S. Education Law.

7.     The Defendant Bill de Blasio is the Mayor of the City of New York , and is responsible for providing public and private school oversight.

8.     The Defendant Thomas P. DiNapoli is the elected Comptroller of the State of New York.

5

9.     This lawsuit is against each of the above school official in his or her official

capacity, and also against each (except AG-elect James and Comptroller DiNapoli) in

their individual capacities to the extent that each may be intentionally violating the

federal and state constitutional rights of the Joshua Doe and Janna Doe plaintiffs and

other similarly situated children.

### A. The "Classes" in Plaintiffs' requested Class Action

10.    Upon information and belief, this complaint sets forth all the prerequisites for

a class action under CPLR § 901 *et seq.*

11.    Plaintiff describes the proposed classes below.

12.    The first proposed class, and a class being immediately, substantially and

irretrievably injured absent corrective action, is the class of all Hasidic children who are

presently receiving less than an adequate secular education in the yeshivas where they are

sent for elementary school and high school education. In other words, Hasidic children

receiving an education that is so deficient in secular instruction that it deprives these

children of the equal protection of the law.

13.    The second proposed class is citizens and taxpayers of municipalities in and

neighboring localities with large populations of Hasidic yeshiva students and who are

thereby directly affected by an exponential growth of a Hasidic population in several

respects, including but not limited to adverse effects upon and challenges[2] to local law

use planning, increased governmental/social services costs, increased municipal and

school district real property tax burdens (e.g., for busing) and, most profoundly, by

---

[2] For example, challenges under the Religious Land Use and Institutionalized Persons Act, 42
U.S.C. § 2000cc et seq. ("RLUIPA") that threaten local governments with multi-million dollar
damage and attorney fees awards relating to land use controls and enforcement.

Case 1:19-cv-00035-BKS-CFH    Document 2    Filed 01/09/19    Page 7 of 105

decreased civic involvement in government, threatening democracy and American values.

14.    Accordingly, Plaintiffs will request that the Court grant class action status as to these two classes.

**B.  Background and interest of Plaintiff Diederich**

15.    Plaintiff Diederich is a citizen, taxpayer and resident who pays taxes to various taxing authorities in the County of Rockland, including taxing entities that both presently and in the foreseeable future will be affected by the exponential growth of the nearby Hasidic community. Plaintiff is a taxpayer of the State of New York, and pays taxes to his town, school district, solid waste authority, the county and the State.

16.    Plaintiff is also a public citizen, a lawyer, and a retired "citizen soldier," with 29 years of service in the U.S. Army Reserve, including active duty tours of duty in Germany (1984-87) during the Cold War, to Iraq (2014-05) and to Afghanistan (2012, Bronze Star medal), retiring in the rank of lieutenant colonel.  Plaintiff's father served in the U.S. Army Air Corps during WW II, and flew 35 missions over Nazi Germany.

17.    As a citizen of the State of New York and as a citizen and patriot of the United States of America, Plaintiff has grave concerns that our democracy is threatened by an American citizenry that is not sufficiently involved in public affairs, and where the citizens are not adequately represented by their elected officials.

18.    Plaintiff also has grave concerns that our democracy is threatened by an American society that is increasingly deficient in the secular education needed for our democracy to survive.

19.    Specifically, if children are not adequately educated in secular fields of study of history, science and civics, they are less likely as adults to understand the needs of democracy as formulated by the United States' Founding Fathers.

20.    By failing to protect the educational rights of Hasidic children, the State of New York and its officials are thereby depriving the children of their constitutional right and duty to become part of an educated, informed citizenry.

21.    Upon information and belief, part of the responsibility of the State Defendants, including the independently elected Attorney General and State Comptroller, is to take appropriate legal action and fiscal action to protect the children, the democracy and the taxpayer.

**C.  Background and interest of Joshua Doe and Janna Doe Plaintiffs**

22.    The fictitious Joshua Doe and Janna Doe plaintiffs represent all Hasidic children currently receiving far less secular education than what is received by public school children in their geographical area; far less than is required to be educated, informed and contributing citizens upon reaching the age of majority; and far less than is need to become self-supporting citizens.

23.    Upon information and belief, the average Hasidic child, upon reaching the age of 19, is not educationally qualified to serve in the N.Y.S. Militia, National Guard or the United States military.

24.    This failure to receive a secular education comparable to that received by public and non-Hasidic private schools (including Catholic parochial and non-Hasidic yeshivas) severely handicaps these children in American civil society in many respects, impairs their ability to participate in public and civic affairs in the broader community, impairs their ability to become members of the federal or state armed forces if needed for

8

the defense of the Nation or the state.  It adversely impacts New York and United States democracy in many respects, including but not limited to inadequately educated and inadequately informed Hasidic adults, as individuals, being less able to make intelligent and informed decisions about candidates and issues on Election Day.

25.    Upon information and belief, the average Hasidic child in the average Yeshiva in New York City, Rockland County and Orange County receive less education for a working life after reaching adulthood than what these Hasidic children's ancestors received in 18th and 19th Century Europe, as the ancestors learned life-supporting education that prepared them for occupations such as farming or a  trade.  18th or 19th Century Hasidic boys did not study religion 9 hours a day.  Yet this seems to be what the 21st Century Hasidic leaders want.

26.    The motivation appears to be to control the children and young adults—e.g., Joshua and Janna Doe—rather than to prepare them for life and an occupation in the working world.

### Hasidic children's constitutional right to an adequate education

27.    Taken to the extreme, Plaintiff believes that if an insular community (religious or otherwise) prevents its members' children from receiving an adequate secular education (an education in the 3 R's,[3]  science, history and civics), a large percentage of the children will find it:

> ➢  difficult or impossible to become informed, contributing citizens of the
>     larger body politic,

---

[3] Reading, writing (in the English language) and arithmetic.

9

Case 1:19-cv-00035-BKS-CFH    Document 2    Filed 01/09/19    Page 10 of 105

➢ difficult or impossible to survive independently in the modern world, not be forced to rely on public assistance;

➢ difficult or impossible to deal with the outside (non-Hasidic) world in many respects, including business, higher education or to qualify for military service (even if called upon to help defend the State or Nation in time of crisis).

28.   Under the N.Y.S. Education Law, public school officials required to enforce the New York State requirement that the children of all private schools (including "religious schools") receive a substantially equivalent education to what is received by public school students.

29.   Upon information and belief, many Hasidic yeshivas in the school districts identified in the caption fail to provide elementary and high school aged children with an education in secular subjects that is even close to being substantially equivalent to that provided in the public schools. Instead, many of the children's education in secular subject is close to no education at all.

30.   Upon information and belief, a fraud is committed upon the children, their parents, and the general public, when the private schools attended by the children do not provide the minimum education required by New York State law.

31.   Upon information and belief, the deficiency is so great as to constitute educational neglect.

32.   Upon information and belief, the N.Y.S. Attorney General, the N.Y.S. Education Commissioner, the N.Y.S. Regents Chancellor should take legal action to prevent such fraud and eliminate this State-condoned educational neglect.

10

33.   The local officials named as defendants should do likewise.

**D. Democracy needs secular education instructive on democracy, human behavior and civics**

34.   Upon information and belief, a sound secular education is needed in today's world in order for the citizenry to maintain a viable democracy under the rule of law. This requires the teaching of history, the social sciences, the biological sciences as relevant to human behavior, and perhaps most importantly, principles of government and civics.

35.   One consequence of the failure of schools in our state and our nation to teach the above-referenced topics is that citizens fall prey to emotional appeals over reason; become tribal in their interactions with other people (their "in-group" versus their perceived opponents' "out-group"); become overly opinionated; and succumb to divisive approaches go politics, with hatred of others and inability to effectively communicate with other the consequence.[4]  Civility in political discourse becomes impossible.

36.   Upon information and belief, the Founding Fathers, as people of the Enlightenment, recognized that informed reason is vital to a democracy.  Religious insularity is anathema to  the needs of a democracy in pluralistic American society.

37.   The failure to soundly educate our children will result in a public—a body politic—that is unable to engaged in rational, civil debate for the welfare of the majority of citizens, respecting the rights of the minority, regarding the vital issues of the day, many of which are important for the long-term survival of our democracy and our Nation.

---

[4] *See, e.g.*, HARARI, SAPIENS: A BRIEF HISTORY OF HUMANKIND (2011); SAPOLSKY, BEHAVE: THE BIOLOGY OF HUMANS AT OUR BEST AND WORST (2017); E.O. WILSON, THE MEANING OF HUMAN EXISTENCE, (2014), E.O. WILSON, ON HUMAN NATURE (1979); LEVITSKY & ZIBLATT, HOW DEMOCRACIES DIE (2018).

38.   The Founding Father's envisioned that an informed, secularly-educated

population is needed to secure a viable democracy.[5]

### E.  Judicial notice of Hasidic educational neglect and other abuse of children

39.   On December 3, 2018, the New York Time published an article describing the

profoundly deficient education received in the Hasidic yeshivas of New York City.[6]

40.   Very informative are many of the comments posted with this new story.

41.   For example, reader Joanna Stasia (from NYC) wrote:

> "When an "outsider" comments on an insular religious school system
> there can be an backlash grounded in the religious freedom rights we all
> hold dear. However, every child has a legal right, per New York State law,
> to a basic education in secular subjects such as English, Math, Science and
> Social Studies in order to graduate with sufficient English language and
> job skills for gainful employment and enough knowledge of America's
> history, laws and governance to understand their rights and duties as
> citizens, to be informed voters, to serve on juries, to participate in their
> own healthcare decisions and to provide for their families. The personal
> and economic repercussions of successive graduating classes of men with
> poor job skills and insufficient English language skills who then marry
> and go on to head very large families need to be addressed. Intense
> religious education provides advantages in terms of their spiritual lives,
> but leaves many graduates underqualified for their real-world adult
> financial responsibilities. The stress of borderline poverty and worse is
> constant for their families and has social, mental health and financial
> implications for them and for the larger secular community in which they
> live. Pre-ordaining, through educational deprivation, a family life
> permanently dependent on a full menu of housing and safety-net subsidies
> for families within the demographic with the highest birth rate is neither
> sustainable nor conscionable."

42.   A reader, Jon (from Austin), wrote:

---

[5] Informative in this regard are the *amicus curiae* briefs of The Center for Educational Equity and
Footsteps, Inc., both briefs filed on November 9, 2018 in *YAFFED v. Cuomo, 18 Civ. 4167
(E.D.N.Y.), infra,* and available on *PACER.*

[6] *See*, *Eliza Shapiro, Do Children Get a Subpar Education in Yeshivas? New York Says It Will
Finally Find Out,* NEW YORK TIMES, Dec. 3, 2018, available at
https://www.nytimes.com/2018/12/03/nyregion/yeshivas-new-york-schools-education.html.

"Religious nationalism is on the rise everywhere in the world including in the U.S. The state has a compelling interest in insuring that our children are properly educated. A secular education is one of the greatest advancements in western civilization. The Founders wanted to throw off the shackles of traditional power sources like institutionalized religion. They were thinking about institutionalized Christianity, of course, but it applies to all faiths. The state's interest is so compelling here that any infringement on the free exercise is justified for the sake of the state but more importantly for the sake of those children."
(*emphasis added*)

43. Another reader, Celidth (from Boulder), wrote:

"When religious leaders and homeschoolers of any variety of any religion develop schools that provide no secular education and/or pass on nonsense as education, it's a feature, not a bug. The Jewish leaders of this group want the children who attend their schools to remain as ignorant as possible of the outside world. That way they won't leave their cult like version of Judaism. Ditto for the evangelical Christians or the fundamentalist Muslims. They all have the same goal: keep their children cloistered and ignorant of the outside world. The problem is that some of their children realize just how badly their families and their religions destroyed their educations. Our country is not served by adults ignorant of the basics of a normal education. And to cheat those children of English literacy is a disgrace."
(*emphasis added*)

44. A seemingly very informed reader, NZieler (New Hartford, NY), wrote:

"I taught history at an ultra-orthodox Mesivta in Williamsburg. I taught grades 9, 10, 11 for forty minute periods, Sundays through Thursdays. Their school calendar, at least for secular studies, was a fraction of the public school calendar. Students took off weeks at a time for Passover, Hanukkah, Rosh Hashana, Yom Kippur, Shavuous, Sukkos, etc. etc. In the classroom, I learned far more about the Torah and Talmud than my students learned about history. We had a deal. I would begin the class with a few pertinent points about American and world history, then they would edify me on what they considered far more substantial and important subjects. The only secular subjects that interested them were business mathematics and accounting. The rest of the curriculum we offered them was, in their minds, a joke. Some of the boys came from immense wealth. For instance, the father of one of my students owned Kedem wine company. The Rebbe determined tuition by the ability to pay. The Kedem wine heir's father paid a small fortune while other kids attended at no cost. That impressed me greatly. What didn't impress me was by the time I arrived at 4:00 each day, the kids were exhausted. They were required to

be up at the crack of dawn and spent 10 hours studying Talmud and Torah
before we got them. Some slept through our classes, and we allowed it
because we had mercy on them!"
(*emphasis added*)

45.  The reader RGoldman56 wrote:

"We don't have doctors and hospitals practicing medicine using practices
and theories codified from the Middle Ages; nor restaurants applying
sanitary practices from that time; nor is our justice system so limited. The
right to a decent education is a human right and consistent with the need
for an informed population in our republican form of self-government.
There can and should be no "religious" out for Yeshivas and no separate
system of religious based educational system funded by the taxpayers.
From another perspective, the inequities, biases and immorality of
fundamental religious belief is brought to the surface in the negligent and
reckless way in which religious dogma denies children the fundamental
right to an education in math, science, American history and English.
(*emphasis added*)

46.  The reader Confucius (NYC) wrote:

"At least one-third of the estimated 7,000 Hasidic families in
Williamsburg receive public assistance, according to neighborhood
leaders. The benefits, including welfare payments, food stamps and
subsidized housing, sustain the families with as many as 10 or 12 children;
they fill the cash registers of the kosher supermarkets on Lee Avenue and
help underwrite much of the work done by the Hasidim, whether in
schools, retail stores or factories." Source:
https://www.nytimes.com/1997/04/21/nyregion/religion-and-welfare-
shape-economics-for-the-hasidim.html

47.  And the reader Tony Francis (Vancouver Island, Canada) wrote:

"It's about time! These kids have been political and religious pawns for
years. The real outrage is it has taken so long to give these kids the basic
rights they deserve as American citizens."

48.  The Court should take judicial notice as to much of what is written above, for

example, that an educated citizenry is vital to a democracy, and that education is vital to

individuals success in life.

Case 1:19-cv-00035-BKS-CFH   Document 2   Filed 01/09/19   Page 15 of 105

### F. Evidence of Hasidic Children's Educational Neglect and Community-directed Deprivation of a Sound Secular Education—the "YAFFED" lawsuit

49.  As to the educational neglect in Hasidic yeshivas, many details are found in a federal action recently filed by "YAFFED" in the U.S. District Court for the Eastern District of New York, as well as in a report prepared by YAFFED entitled *Non-Equivalent: The State of Education in New York's Hasidic Yeshivas* (Sept. 2017).[7] The federal complaint is discussed next.

50.  A complaint filed by the non-profit organization *Young Advocates for Fair Education ("YAFFED") v. Andrew Cuomo, Betty Rosa and Mary Ellen Elia,* 18 Civ. 4167 (E,D,N,Y,) alleges facts that are in many respects very relevant to this action.

51.  Supportive affidavits filed in the YAFFED federal action corroborate many of the allegations, and *amicus curiae* briefs filed on behalf of the Plaintiff YAFFED are informative. *See*, footnote 4 *supra*.

52.  In this regard, if the Defendants deem it appropriate to remove this case to federal court, and appropriate federal venue is undoubtedly the U.S. District Court for the Eastern District of New York, a) because the YAFFED federal action is pending there, and b) because this venue (which includes Brooklyn) includes the largest number of Hasidic children being inadequately educated in New York State.

53.  Some particularly relevant facts or allegations set forth in the YAFFED federal action are as follows:

> YAFFED ¶ 1. On April 12, 2018, New York Governor Andrew Cuomo signed into law a budget that included an amendment to New York Education Law, Section 3204, section 2 that created a carve-out for the benefit of certain ultra-Orthodox Jewish non-public schools, giving them special treatment under the law (the "Felder Amendment").

---

[7] Available online at: https://www.yaffed.org/report

15

*See,* Felder Amendment, Part SSS of N.Y. Senate Bill S7509C [3/30/18].

YAFFED ¶ 2. New York State Education Law, Section 3204, mandates that children in nonpublic schools receive instruction that is "substantially equivalent to the instruction given to minors of like age and attainments at the public schools of the city or district where the minor resides." This statute requires these non-public schools to meet certain minimum educational standards and applies to non-public religious schools as well as independent secular schools.

YAFFED ¶ 3. The Felder Amendment creates a dual oversight regime to determine whether a non-public school provides a "substantially equivalent" education for the nearly 1,700 nonpublic schools in New York: one set of considerations applying to ultra-Orthodox Jewish schools—known as yeshivas and sometimes referred to as *mosdos*—as determined by the New York State Education Department ("NYSED") Commissioner; and another set of considerations for all other non-public schools, including independent schools and other religious schools, as determined by local school districts and boards.

YAFFED ¶ 4. Upon information and belief, many of the nearly 115,000 children who are currently educated in ultra-Orthodox Jewish non-public schools in New York State attend schools that do not provide sufficient instruction in secular subjects as required by the law. [*emphasis added*]

YAFFED ¶ 8. The Felder Amendment describes the schools that fall within the newly created carve-out in very specific terms: non-profit schools with a bi-lingual education program that extends from 9:00 a.m. until 4:00 p.m. for grades 1 through 3; until 5:30 p.m. for grades 4 through 8; and until 6:00 p.m. for high school. The requirements for high school only extend to programs established for children who have graduated from a middle school that meets this criteria, i.e., elementary-school yeshiva graduates. Upon information and belief, only ultra- Orthodox Jewish schools, including Hasidic yeshivas, meet this criteria. [*emphasis added*]

54.    The allegation found in the prior paragraph at "YAFFED ¶ 8" deserves some specific comment.  First, upon information and belief, the Felder Amendment appears designed to apply only to ultra-Orthodox/Hasidic schools, and as such, creates special rules for the children being singled out for special exemption.

55.    Second, the provision creates a strong incentive for private schools to adopt the school hours indicated above, even if such long in-school hours are detrimental to the children.

16

Case 1:19-cv-00035-BKS-CFH    Document 2    Filed 01/09/19    Page 17 of 105

56.    Third, upon information and belief, the long school hours are detrimental to the children in several respects, including depriving the children of time needed to engage in activities essential to intellectual and physical development (e.g., time play, to engage in "after-school" activities such as clubs, sports, or a part-time job), and preventing the children from interacting with other children and the society outside the schoolhouse. Moreover, the mental and physical well-being of the children may be harmed as they are essentially confined, all day long, in a schoolhouse—sometimes a very small schoolhouse.

57.    Fourth, upon information and belief, the children are essentially forcibly confined to a religiously-insular island, and deprived of the ability or opportunity to interact with anyone outside of their religious sect.  The detrimental treatment of the children appears to be done for the purpose of maintaining their isolation from the outside world, for the larger purpose of maintaining the insularity of the Hasidic community and maintaining control (indeed, authoritarian control) by its religious leaders.

58.    Upon information and belief, a pluralistic democracy cannot thrive, or even succeed, if a significant percentage of the society becomes insular "tribes," isolated from the larger society.

59.    The federal YAFFED complaint continues:

> YAFFED 9. Furthermore, the new standards created by the carve-out in the Felder Amendment are vague and impose new considerations only for ultra-Orthodox non-public schools that appear substantially relaxed as compared to the guidelines issued by NYSED for all non-public schools.

> YAFFED 11. The Felder Amendment is the brain child of State Senator Simcha Felder, a New York State Senator for the 17th District, and certain ultra-Orthodox Jewish community leaders who oppose oversight, including Grand Rabbi Aaron Teitelbaum, the chief rabbi and spiritual leader of the Satmar ultra-Orthodox community in Kiryas Joel, New York. Upon information and belief, Rabbi Teitelbaum has been and is the chief

17

authority in ultra-Orthodox parochial schools in Kiryas Joel. ***

YAFFED 12. On information and belief, there is no secular legislative purpose for the Felder Amendment and its principal effect promotes the religious beliefs of the ultra-Orthodox Jewish community with respect to education. On information and belief, the intent of this amendment was to inoculate the ultra-Orthodox Jewish non-public schools from scrutiny. On information and belief, the Felder Amendment was written such that only ultra-Orthodox Jewish non-public schools fit the recited criteria for this carve-out.

YAFFED ¶ 16. The Felder Amendment violates the Establishment Clause of the first amendment to the U.S. Constitution.

YAFFED ¶ 17. YAFFED seeks a declaration that the Felder Amendment is unconstitutional and an injunction preventing Defendants Cuomo, [Betty] Rosa, and [MaryEllen] Elia, in their official capacity as Governor of New York, Chancellor of the New York State Board of Regents ("Board of Regents"), and NYSED Commissioner, from taking actions consistent with the Felder Amendment and to maintain the status quo.

60.    The Yaffed complaint identifies the parties to its complaint, and their

responsibilities, at YAFFED ¶ 18 through ¶ 22, including its allegations:

YAFFED ¶ 18. Plaintiff YAFFED is a nonprofit organization based in New York City, New York, with offices at 25 West 45 Street, New York, New York. YAFFED is an advocacy group committed to improving educational curricula within ultra-Orthodox schools. YAFFED believes that every child is entitled to a fair and equitable education that is in compliance with the law. YAFFED's mission is to ensure that all students receive the critical tools and skillsets needed for long-term personal growth and self-sufficient futures.

YAFFED ¶ 19. *** YAFFED encourages compliance with relevant state guidelines for education while maintaining respect for the primacy of Judaic studies and the unique cultural and religious values of the ultra-Orthodox community.

YAFFED ¶ 21. The Board of Regents is a governmental agency responsible for determining the educational policies of the State of New York and establishing "rules for carrying into effect the laws and policies of the state, relating to education." N.Y. Educ. Law § 207. The Board of Regents serves as the head of NYSED and must appoint a Commissioner of Education to be the chief administrative officer of the department. N.Y. Const. art. V, § 4; see also N.Y. Educ. Law § 101. The Board of Regents also has the power to remove the Commissioner. N.Y. Const. art. V, § 4.

---

[8] Ceasing NYC's investigation of deficient Hasidic education is described in the NY Times article cited at footnote 3, above.

Case 1:19-cv-00035-BKS-CFH   Document 2   Filed 01/09/19   Page 19 of 105

Defendant Betty A. Rosa is the Chancellor of the Board of Regents. Chancellor Rosa is responsible for the general supervision of all educational activities within the state, including determining the educational policies of the state and carrying into effect the educational law and policies of the state. See N.Y. Educ. Law § 207; N.Y. Educ. Dep't Bd. Of Regents (2015), http:www.regents.nysed.gov. Chancellor Rosa also "may visit, examine into and inspect, any institution in the university and any school or institution under the educational supervision of the state, and may require, as often as desired, duly verified reports therefrom giving such information and in such form as the regents or the commissioner of education shall prescribe." N.Y. Educ. Law § 215. *** [*emphasis added*]

YAFFED ¶ 22. The New York State Education Department ("NYSED") is a governmental agency responsible for the "general management and supervision of all public schools and all of the educational work of the state." N.Y. Educ. Law § 101. NYSED implements the policies of the Board of Regents under the direction of the Commissioner of Education. NYSED is also responsible for supervising New York state's nonpublic schools. N.Y. Comp. Codes R. & Regs. tit. 8, § 100.2 (2016). Defendant MaryEllen Elia is the New York State Commissioner of Education and President of the University of the State of New York. As the chief executive of NYSED, Commissioner Elia is responsible for enforcing all "laws relating to the educational system of the state" and executing "all educational policies determined upon by the board of regents." N.Y. Educ. Law § 305. Commissioner Elia has the duty and power to supervise "the enforcement of part one of this article [Article 65]" which includes New York state education law section 3204. Id. § 3234. Commissioner Elia is also responsible for identifying failing and persistently failing New York schools. N.Y. Comp. Codes R. & Regs. Tit. 8, § 100.19(b) (2016). Plaintiff brings this action against Commissioner Elia in her official capacity. She is located at NYSED, State Education Building, 89 Washington Avenue, Room 110, Albany, New York 12234. [*emphasis added*]

61.   The prior paragraph, "YAFFED ¶ 18 - 19," deserves some specific comment.

First, Yaffed's interest is the personal welfare and advance the interests of Hasidic people.  Thus, Yaffed's stated interest are narrower than that which the larger body politic would expect from its members, namely, the ability to engage in an educated, informed way in matters of interest to the larger body politic (town, city, county, state and country).

19

62.  Second, the larger society and state law require more than what Yaffed alleges at its ¶ 19.  The law, and democracy, require respect for both the law and the democracy, rather than any purported "primacy" of any particular religious study or any particular religious values.  The traditional American doctrine of the separation of church and state means that neutral laws of generally applicability apply to all, regardless of religious belief, and that a citizens religious beliefs are inviolate (in contrast to his or her actions and conduct, which is subject to reasonable regulation for the protection and welfare of the larger society and the democracy).  *See, e.g.,* MARCI HAMILTON, GOD VS. THE GAVEL *(Rev. 2d Ed. 2014); Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872 (1990).

63.  Third, the State Chancellor of the Board of Regents and State Commission of Education appear to have a clear duty to educationally protect Hasidic children who, under State law, should be receiving a sound secular education but are not.  They should enlist the N.Y.S. Attorney General and the local school officials to take appropriate legal action to safeguard these children's constitutional rights, and to safeguard our democracy.

64.  The Yaffed federal complaint, at YAFFED ¶ 23 - 25, seek declaratory relief in that the Felder Amendment is unconstitutional.

65.  The Yaffed federal complaint then alleges its "Factual Background" and its discussion of the "Education of Minors in New York":

**FACTUAL BACKGROUND**

A. Education of Minors in New York

YAFFED ¶ 26. The "Education Clause" in Article XI, section 1 of the New York State Constitution, provides that "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." N.Y. Const. art. XI, § 1. This provision is not a mere platitude or an abstract ambition that the State has no obligation to fulfill. It is a mandate the State is

20

constitutionally obligated to execute and accomplish for all New York children. It ensures the availability of a "sound basic education" to all children in the State. *Board Of Education v. Nyquist*, 57 N.Y.2d 27 (1982). It is a "constitutional floor with respect to educational adequacy." *Campaign for Fiscal Equity, Inc. v. State of New York*, 86 N.Y.2d 307 (1995). In *Campaign for Fiscal Equity*, the N.Y. Court of Appeals upheld the basic rights of children to obtain "the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury." *Id*. at 316. (*emphasis added*)

YAFFED ¶ 27. New York's Compulsory Education Law requires every child in the state between the ages of 6 and 16 attend school or receive home instruction. Although it compels instruction, the law permits instruction in non-public schools, such as independent secular schools or religious schools. N.Y. Educ. Law § 3205. The requirements of the New York Compulsory Education Law apply regardless of where a child receives instruction, at a public school, nonpublic school or at home. (*emphasis added*)

YAFFED ¶ 28. Section 3204 of the New York Compulsory Education Law dictates the "Instruction Required" of all students, with Subsection 2 specifying the quality and language of instruction. For example, it requires instruction by a competent teacher. Id. § 3204(2). It requires instruction using English and sets forth accommodations for bi-lingual instruction. Id.

YAFFED ¶ 29. Of particular relevance here, Section 3204 subsection 2 states in relevant part: "Instruction given to a minor elsewhere than at a public school **shall be at least substantially equivalent** to the instruction given to minors of like age and attainments at the public schools of the city or district where the minor resides." *Id*. § 3204(2) (emphasis added). The requirement of "substantial equivalence" recited in the law existed prior to the Felder Amendment and applied to all instruction "elsewhere than at a public school." *Id.* (*emphasis in original*)

YAFFED ¶ 31. For public schools, the curriculum for grades one through eight must include instruction in the subject areas of arithmetic, reading, spelling, writing, the English language, geography, United States history, civics, hygiene, physical training, the history of New York State, and science. N.Y. Educ. Law § 3204(3). (*emphasis added*)

YAFFED ¶ 32. Beyond the first eight years, i.e., in high school, academic instruction must include instruction in the English language and its use, civics, hygiene, physical training, and American history including the Declaration of Independence and the Constitution of the United States. *Id*.

YAFFED ¶ 33. Public schools are also required to offer instruction in patriotism and citizenship and in certain historic documents. N.Y. Educ. Law § 801(1)-(2). Similar instruction is required in private schools. *Id*. "If such courses are not so established and maintained in a private school,

attendance upon instruction in such school shall not be deemed substantially equivalent to instruction given to pupils in the public schools of the city or district in which such pupils reside." *Id.* (*emphasis added*)

YAFFED ¶ 35. Upon information and belief, the Felder Amendment does not change any of the required instruction in public schools in the Compulsory Education Law.

66.    The federal YAFFED complaint continues, describing the education of

Hasidic children in New York State:

> B. Education in Ultra-Orthodox Yeshivas in New York

> YAFFED ¶ 36. Orthodox Judaism is a general term for the most strictly traditional denominations of Judaism. A sub-sect of Orthodox Judaism are the "haredim," who are Jews who continue to maintain traditional practices without regard to the modern world. In this complaint, we will refer to haredim as "ultra-Orthodox." The largest sub-group of haredim are known as Hasidim or Hasidic Jews. (*emphasis added*)

> YAFFED ¶ 37. A large number of haredim reside in Brooklyn, in this district. Another large number of Hasidic haredim reside in the village of Kiryas Joel, in Orange County, New York.

> As the U.S. Supreme Court described the community:

> The residents of Kiryas Joel are vigorously religious people who make few concessions to the modern world and go to great lengths to avoid assimilation into it. They interpret the Torah strictly; segregate the sexes outside the home; speak Yiddish as their primary language; eschew television, radio, and English-language publications; and dress in distinctive ways that include head coverings and special garments for boys and modest dresses for girls. Children are educated in private religious schools, most boys at the United Talmudic Academy where they receive a thorough grounding in the Torah and limited exposure to secular subjects, and most girls at Bais Rochel, an affiliated school with a curriculum designed to prepare girls for their roles as wives and mothers. (*citation omitted*; *emphasis added*)
> *Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 691 (1994).

> YAFFED ¶ 38. According to a report from the Avi Chai Foundation, as of 2013, more than 52,000 children were enrolled in Hasidic schools in New York City. According to a 2011 report on the New York Jewish community by the UJA Federation of New York, approximately 94% of Hasidic residents in the eight counties in the New York City area (New York, Kings, Queens, Richmond, Bronx, Westchester, Nassau and Suffolk) live in Brooklyn. [*footnote & citations omitted; emphasis added*]
> On information and belief, that population has been growing and

22

continues to grow.

YAFFED ¶ 39. Hasidic parents typically send their children to parochial non-public schools, where they can ensure their children's social and cultural interactions are consistent with ultra- Orthodox norms.

YAFFED ¶ 40. As of June 2018, there are 273 Orthodox yeshivas registered on the NYSED Directory of Non-public School Administrators. [*footnote 5 omitted*] 211 of these yeshivas are located in Kings County.

YAFFED ¶ 41. Although non-public schools are required by state law to provide a substantially equivalent secular education, on information and belief, <u>almost no secular education is provided at most Hasidic ultra-Orthodox Jewish non-public schools, particularly to male students</u>. The language of instruction is almost exclusively Yiddish, the same language the students speak at home, and sometimes includes some Hebrew and/or Aramaic texts. From age 7 to age 12, on information and belief, <u>the average Hasidic boy receives instruction in basic English reading, writing, and arithmetic, for at most 90 minutes a day (at the end of the school day), four days a week. Often the period of time set aside for secular studies is treated as free time for restless students. Textbooks are heavily censored, when they are used at all. Teachers in Hasidic yeshivas are often unqualified to teach secular studies, as they barely know English themselves. Even English classes may be taught primarily in Yiddish.</u> (*emphasis added*)

YAFFED ¶ 42. Once a <u>male student</u> in the Hasidic community enters <u>high school, he typically spends twelve to fourteen hours a day receiving instruction only in Judaic studies, but receives no secular education in school</u>. (*emphasis added*)

YAFFED ¶ 43. In a recent survey conducted by plaintiff of yeshiva graduates and parents of current students, including those who attended Hasidic yeshivas in New York City, not a single respondent said that their school provided instruction in every subject required by the state. <u>Only about 65% of elementary school aged children who attended Hasidic yeshivas in New York City reported having received some education in English reading, in English writing, or in arithmetic.</u>

<u>Less than a quarter reported learning U.S. History, and only a few learned New York history. Very few Hasidic boys in the survey received instruction in science or geography. None recalled any education in art or music. Of the respondents who attended elementary-level yeshivas for boys in New York City, just over a quarter said they received no secular education at all in elementary school. At the high school level, only a quarter of respondents said they received any secular education, which was typically optional and often discouraged by the school. Thus a substantial majority of high school aged respondents received no secular education of any kind.</u> (*emphasis added*)

23

YAFFED ¶ 44. These results are confirmed by anecdotal evidence from the community. In a recent news article, three former students recounted the lack of education and the resulting struggles to catch up after high school. In one case, the former student was also a parent of three children enrolled in ultra-Orthodox schools. Yoel Falkowitz, a member of the Satmar ultra- Orthodox community in Monsey, New York states in the article that "I never heard the word 'algebra' until I was an adult. I only know addition, subtraction, and multiplication." He states that he had to teach himself reading and writing in English. He states in the article that his son's experience at a yeshiva in Monsey is worse than his experience. While he acknowledges that secular instruction at his son's school is provided for one hour, he complains that the yeshiva hires unqualified former students as teachers who "can't string a decent sentence together." [*footnote 6 omitted; emphasis added*]

YAFFED ¶ 45. Notably, as discussed below, even Hasidic ultra-Orthodox community leaders have conceded that many Hasidic ultra-Orthodox Jewish yeshivas are not substantially equivalent to the required instruction in public schools under New York law as it existed prior to the Felder Amendment.

YAFFED ¶ 46. The unavailability of adequate secular instruction for these students in certain Hasidic ultra-Orthodox Jewish yeshivas results in poor performance on New York standardized tests, known as Regents tests (to the extent tests are taken by these students). Many of these schools do not administer Regents tests nor provide diplomas. As a result, upon information and belief, graduates find it extremely challenging to pursue post-secondary education to attain the skills they need. (*emphasis added*)

YAFFED ¶ 47. This puts Hasidic families at high risk for poverty and reliance upon government assistance. In a 2011 study on poverty published by the UJA-Federation of New York analyzing an eight-county New York area that includes New York City, approximately 45% of Hasidic households in New York were classified as poor and another 18% were classified as near poor. See Jacob B. Ukeles, et al., Jewish Community Study of New York: 2011 Special Report on Poverty, UJA Federation of N.Y. (revised ed. June 2013), at 47. [*footnote 7 omitted*] The study noted "a very strong relationship between secular educational attainment and poverty" and that "[l]evels of educational attainment have decreased significantly for poor Jewish households since 2002," as of the report's issuance in 2011. Id. at 38. Upon information and belief, those levels have not improved since 2011. (*emphasis added*)

YAFFED ¶ 48. Upon information and belief, Hasidic communities in Brooklyn have a greater percentage of families receiving cash assistance, food stamps, public health care coverage, and Section 8 housing vouchers, as compared to Brooklyn and New York City as a whole. Upon information and belief, the percentage of people in a heavily Hasidic district of Brooklyn utilizing public income support, such as cash

assistance (TANF), Supplemental Security Income (SSI), and Medicaid, has increased in the last decade as the Hasidic population grew rapidly. (*emphasis added*)

YAFFED ¶ 49. Upon information and belief, the Hasidic population in New York City is expected to continue to grow rapidly, with especially high growth among children and young people, so that by 2030 up to one-eighth of the city's schoolchildren, and up to one-third of Brooklyn's, may be Hasidic. (*emphasis added*)

YAFFED ¶ 50. Upon information and belief, yeshivas benefit from hundreds of millions of taxpayer dollars annually. Upon information and belief, in addition to federal funds, state funding is provided to yeshivas through, among other programs, Academic Intervention Services (AIS), Nonpublic School Safety Equipment (NPSE), Mandated Services Aid (MSA), and the Comprehensive Attendance Program (CAP). Upon information and belief, many if not most Hasidic ultra-Orthodox yeshivas in this District receive significant funding from the state funded, city-run Child Care Block Grant Subsidy Program. (*emphasis added*)

YAFFED ¶ 51. The lack of secular education in Hasidic yeshivas has been public knowledge for decades. In 1994, the New York Times published an article on Hasidic yeshiva Olohei Torah that pointed out that the school "spurns all secular studies for its 340 young men, ages 13 to 20," and "boys are expected to learn any science, mathematics or history on their own." [*footnote 8 omitted*; *emphasis added*]

67.    The federal YAFFED complaint describes the Hasidic leadership's efforts to exempt Hasidic children from the State's secular education requirements:

D. The Effort to Exempt Ultra-Orthodox Jewish Yeshivas from Enforcement of Section 3204

YAFFED ¶ 61. By 2018, upon information and belief, leaders within the ultra-Orthodox community in New York State, including Grand Rabbi Aaron Teitelbaum, who leads the Satmar Hasidic sect in Kiryas Joel and oversees the Hasidic yeshivas in Kiryas Joel as well as some Hasidic yeshivas in Brooklyn, grew more concerned that the state and city would soon begin actually overseeing ultra-Orthodox yeshivas, revealing that many are not offering a "substantially equivalent" education. These efforts resulted ultimately in the unconstitutional Felder Amendment to Section 3204 of the Education Law.

YAFFED ¶ 64. Rabbi Teitelbaum also acknowledged that the efforts of NYSED to investigate complaints about instruction at the ultra-Orthodox yeshivas were causing distress within the community …:

YAFFED ¶ 65. Upon information and belief, the leaders within the ultra-

25

Orthodox community who opposed oversight by the State determined that changing the law was the only way to avoid oversight, a path that they recognized was difficult under the normal legislative process. ***

68.   The federal YAFFED complaint then describes the "Felder Amendment":

### E. The Felder Amendment to Section 3204

YAFFED ¶ 74. The Felder Amendment added language to Section 3204 that defined "substantially equivalent" as it applied to certain non-public schools and charged the Commissioner of NYSED with enforcing Section 3204 for those schools. A copy of the text of Part SSS of budget bill S7509C reflecting the Felder Amendment is attached to this complaint as Exhibit 1.29

YAFFED ¶ 75. The Felder Amendment has three basic parts:

a) It adds criteria for substantial equivalence for certain schools for grades 1 through 8. Educ. Law § 3204(2)(ii) (as amended April 12, 2018).

b) It adds criteria for substantial equivalence for certain high schools for students who have graduated from elementary schools covered by 3204(2)(ii). Educ. Law § 3204(2)(iii) (as amended April 12, 2018).

c) It provides the Commissioner with the authority to determine if schools meet subsection (ii) and (iii) as amended. Educ. Law § 3204(2)(v).

YAFFED ¶ 76. Under the Felder Amendment, subsection (ii) applies to non-public elementary and middle schools that are non-profit corporations, have a bi-lingual program, and have an education program that extends from 9:00 a.m. to no earlier than 4:00 p.m. for grades 1-3 and to no earlier than 5:30 p.m. for grades 4-8. Upon information and belief, no non-public schools in New York state meet this description other than ultra-Orthodox Jewish elementary and middle school yeshivas.

YAFFED ¶ 77. Under the Felder Amendment, NYSED's evaluation of "substantial equivalence" under Section 3204 of the non-public elementary and middle schools subject to subsection (ii) shall include consideration of:

> if the curriculum provides academically rigorous instruction that develops critical thinking skills in the school's students, taking into account the entirety of the curriculum, over the course of elementary and middle school, including instruction in **English** that will prepare pupils to read fiction and nonfiction text for information and to use that information to construct written essays that state a point of view or support an argument;

> instruction in **mathematics** that will prepare pupils to solve real world problems using both number sense and fluency with mathematical functions and operations;

26

instruction in **history** by being able to interpret and analyze primary text to identify and explore important events in history, to construct written arguments using the supporting information they get from primary source material, demonstrate an understanding of the role of geography and economics in the actions of world civilizations, and an understanding of civics and the responsibilities of citizens in world communities; and instruction in **science** by learning how to gather, analyze and interpret observable data to make informed decisions and solve problems mathematically, using deductive and inductive reasoning to support a hypothesis, and how to differentiate between correlational and causal relationships.

Section 3204(2)(ii) (as amended) [*emphasis in original*].

YAFFED ¶ 78. Subsection (ii) of the Felder Amendment provides a more limited list of subjects for which instruction is considered to determine substantial equivalence, as compared to the current NYSED Guidelines, which also require instruction in spelling, music, health education, physical education, visual arts, practical arts, home and career skills, and library and information skills.

YAFFED ¶ 81. Under the Felder Amendment, evaluation of "substantial equivalence" under Section 3204 of the non-public high schools subject to subsection (iii) by NYSED shall consider:

> "<u>if the curriculum provides academically rigorous instruction that develops critical thinking skills</u> in the school's students, the outcomes of which, taking into account the entirety of the curriculum, <u>result in a sound basic education</u>." [*formatting & emphasis added*]

YAFFED ¶ 82. Notably, subsection (iii) does not require instruction in English or any subjects required by the current NYSED guidelines for substantial equivalence in non-public schools.

Upon information and belief, subsection (iii) is intended to allow the use of instruction in Judaic studies during high school to help determine whether instruction is "substantially equivalent" even if the subject areas required for public schools are not taught.

69.    The federal YAFFED complaint goes on to explain that New York State legislative officials have acknowledged that the Felder Amendment is designed to apply only to the Hasidic schools, and designed to assist the Hasidic leadership's views as how those schools should be operated and what should be taught:

Case 1:19-cv-00035-BKS-CFH     Document 2     Filed 01/09/19     Page 28 of 105

YAFFED ¶ 84. Leaders in the ultra-Orthodox Jewish communities in which these schools were established as well as legislators like Senator Felder and Senate Majority Leader John Flanagan <u>have all admitted in public statements that the Felder Amendment is meant to apply only to the specific parochial non-public ultra-Orthodox yeshivas.</u> [*emphasis added*]

YAFFED ¶ 88. Upon information and belief, the Felder Amendment is viewed as an endorsement by the state of the religious education choices made by ultra-Orthodox communities. For example, upon information and belief, David Zweibel, the leader of Agaduth Israel, an Orthodox Jewish advocacy group that has taken a position against state oversight of ultra-Orthodox schools, stated in an interview, delivered in Yiddish, available on a telephone hotline called Kol Mevaser, (212) 444-1100, on or after April 2, 2018, just after the Passover holiday: And the main thing is to understand that this is a battle for the Torah institutions across the entire state of New York, in Brooklyn, in Monsey, in Kiryas Joel, in the entire State of New York. Which—I don't know the exact number—tens of thousands of children are educated in these institutions, and yeshivas. And the situation is very serious. We just hope that what Senator Felder has done, according to the instructions of the sages, and together with all the other activists, we hope that—we speak now of "Our Time of Freedom" [the Passover holiday], which is apropos of the world today, and we should remember that the night of Passover was a time that the law was changed of New York. A new law was passed, which for the first time recognizes that the education we receive in yeshiva is a rigorous academic education, which sharpens the mind. And a child that goes through the yeshiva system is a child that has had a good education. We hope, with God's help, that this will at least be part of the salvation that we need.

70.    Essentially, as seen from the above YAFFED allegations, the express and implied admissions of the N.Y.S. legislative leaders, and its "admissions through conduct" (the placating of the Hasidic leadership's interests legislatively) clearly reveal that the State legislature (through the Felder Amendment) took legislative action designed of assisting in the establishment of the Hasidic religion (its religious community) in New York State.  This legislative action is in direct contravention of the Establishment Clause of the U.S. Constitution.

71.    The federal YAFFED complaint makes similar allegations:

YAFFED ¶ 89. As such, the Felder Amendment has the effect of

28

Case 1:19-cv-00035-BKS-CFH    Document 2    Filed 01/09/19    Page 29 of 105

privileging a particular religion, specifically ultra-Orthodox groups such as the Hasidic sect, and subjecting schools of that particular religion to lower educational standards—unsurprisingly, given that the public statements and circumstances surrounding its passage demonstrate that privileging ultra- Orthodox Jewish yeshivas was the purpose of the Amendment.

YAFFED ¶ 90. Finally, the Felder Amendment's vague standard for high school requiring "academically rigorous instruction that develops critical thinking skills in the schools' students, the outcomes of which, taking into account the entirety of the curriculum, result in a sound basic education," will excessively entangle New York State and local governments with the religious decisions of these ultra-Orthodox Jewish yeshivas. (*emphasis added*)

72.    However, the YAFFED complaint does not go far enough in its challenges to the unlawfulness and constitutionality of the Felder Amendment, and the non-response of State government to an insular religious sect's theocracy denying the sect's children of the secular education they need to survive in the modern world, and, just as importantly, denying the larger body politic of a sufficiently educated, informed, citizenry that a liberal, pluralistic democracy requires to survive in the 21st Century.

73.    Perhaps most revealing regarding the Felder Amendment's unconstitutionality is the language of the amendment quoted at YAFFED ¶ 81, above, which states that the N.Y.S. Education Department shall consider whether:

> "the curriculum provides academically rigorous instruction … the outcomes of which, taking into account the entirety of the curriculum, result in a sound basic education."

In other words, under the Felder Amendment N.Y.S. State Education Department employees or N.Y.S. Regents employees will be required to look at the curriculum and instruction taking place in a Hasidic-run yeshiva, with essentially all instruction in Yiddish or Hebrew, with Talmud and Torah religious instruction dominating 90% or more of the students' attention, and then somehow conclude that the students are

29

receiving a "sound basic education." The State employees will be required to do this notwithstanding that the phrase "sound education" has no objective measure, and where "sound education," in the eyes of the Hasidic religious sect's leadership is essentially learning religious beliefs through the sects interpretation of the Talmud, Torah and other religious texts, with knowledge of the outside secular world disdained. This is an impossible task. It is also a task that is impossible for the government to undertake without intrusion into the Hasidic sect's religious beliefs, and thus it is a constitutionally impermissible task as the Church-State entanglement is simply too great, with the State being compelled to intrude into this particular Church, but with no guideposts as to what "secular" items to examine. Church and State should remain separate under our American constitutional republic. The Felder Amendment violates this basic American constitutional principle.

74.     The State's response can and must be a simple response, albeit a painful one. New York State's constitutional and statutory mandate that all children in this State receive a sound secular education must be enforced. And enforced now! No individual or group of individuals, regardless of religious belief, have the right to deny their children their right to a sound education such that they can be valuable, contributing citizens of our pluralistic New York body politic and American society. No individual or group of individuals, regardless of religious belief, have the privilege to claim exemption from neutral laws of general applicability, such as New York's compulsory education laws.

75.     Moreover, the larger society has the right to enact and enforce laws that safeguard the common weal, the public fisc, the greater public welfare and the democracy. No religious sect can exempt itself from this. Otherwise, the country could

degenerate into numerous insular tribes of any and all ideological persuasions: ultra-conservative, ultra-liberal, ultra-communist, neo-Nazi, ultra-Catholic, ultra-Protestant, ultra-Evangelical, and ultra-Name-The-Religion.  The American experiment in democracy—and the brilliance of the Founding Fathers in seeing the need to prohibit the establishment of religion—cannot survive if theocracies are established in lieu of secular governance.  Government cannot tell people what to believe.  The Free Exercise Clause protects that.  But Government must require its citizens to receive a sound, secular education, because to do otherwise establishes religion, and disestablishes liberal republican democracy.

76.   The Hasidic leadership clearly desires to control and govern its members, creating a *de facto* religious government within the territory of New York State and the United States.  The Hasidic leadership seeks to govern its members' children for its own self-interested, essentially tribal purposes.[9]  However, this is not its right.

77.   The right to individual religious belief is constitutionally protected under the Free Exercise Clause of the First Amendment.

78.   However, the right to underline cultural belief, and cultural autonomy, is not a Free Exercise Clause right.  It is not protected religious activity. The American constitutional system allows the State to attempt to influence individuals, and does so in countless respects:

> ➢ Recitation of the Pledge of Allegiance at the start of governmental meetings;
>
> ➢ The playing of the National Anthem at sports events;

---

[9] Native Americans may have such right, but they were essentially separate nations before being conquered, and their legal status in the United States is governed by treaties.  Insular religious groups have no comparable legal status.

31

> The statements "In God we Trust" and "*E pluribus unum*" on our currency and elsewhere; and most importantly, by

> Enacting laws intended to benefit and protect all the people, the general welfare, and the democracy.

79.    Individuals have a First Amendment right to decline to recite the Pledge, or to sing the Anthem, or to agree that the Nation is trusting anything to God.

80.    But citizens do <u>not</u> have the right to decline to obey laws of neutral application enacted for the general welfare.  If the citizens of a particular religious persuasion wish to become exempt from any such law, their recourse is to exercise their First Amendment right to petition government, by asking their elected officials to provide them with an otherwise permissible religious exemption.

81.    The United States has been a very religion-oriented Nation, and for this reason religious exemptions to all sorts of laws are common (tax exemptions and conscientious objection to military service being two of the most prominent), as the Court is well aware.

82.    The political power of organized religion has increasingly been applied to benefit religious groups, for example, by allowing taxpayer-funded busing of children, and the taxpayer-funded provision of secular textbooks (acts of legislative grace, not constitutional entitlement).

83.    The political power of organized religion has influenced national politics and the rights of Americans in profound ways.[10]  For example, Congress enacting the Hyde Amendment prohibiting Medicaid-funded abortions (on obvious religious grounds); the proposed repeal of the Johnson Amendment (to permit tax-exempt Churches to engage in

---

[10] A description of the exceptional power that organized religion has in American society can be found in the book GOD VERSUS THE GAVEL (2d Ed.), by Professor Marci Hamilton.

partisan political activity); and the enactments of RFRA and RLUIPA. The federal courts are empowering organized religion, such as by immunizing Church-affiliated employers against civil suits by their employees, even lay employees.[11] The U.S. Supreme Court has allowed corporations "religious free exercise" rights under *Hobby Lobby*[12] (by denying the rights of women) and has upheld prayer at municipal government meetings.[13] The President of the United States panders to the religious right and evangelicals. The interests of organized religion cause conservative Jews to ally with conservative Catholics to ally with conservative Evangelical Protestants for the purpose of diminishing the power and influence of moderate or liberal groups or non-believers, and for the purposes of increasing the role of religion and the power of organized religion in civil society.

84. The reader may disagree with some or all of what is written in the prior paragraphs. These are sound topics for public debate. Yet intelligent, reasoned debate is impossible with a citizen who has not received a basic education in American history, science and civics. And without rationale debate, democracy under the rule of law becomes impossible.

### G. The Power of "Block Voting"

85. In New York's politics, the power and influence of the Hasidic community's is well known. When an entire village of, say, 10,000 voters votes 100% for one candidate, that may have the same electoral power as a town of 100,000 voters voting

---

[11] *See*, *Fratello v. Archdiocese of New York,* 863 F. 3d 190 (2d Cir. 2015).

[12] *See*, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct 2751 (2014).

[13] *See*, *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014).

55% to 45% for one candidate—the ten percent differential being a landslide victory, yet amounting to 10,000 votes—the same as the Hasidic village.

86.    This is the power of block voting, and why is scares the heck out of New York politicians.  And why politicians who have a sizable Hasidic constituency must either bend to the Hasidic will, or be voted out of office. [14]

87.    In a Wikipedia page cited below, there is a description of how the Hasidic village of Kiryas Joel's "block vote" was significant in the election of Congressman  John Hall (of Orleans rock and roll fame). It also became an issue in Hilary Clinton's election to the U.S. Senate, after she received the Village of New Square block vote, with President Clinton thereafter commuting the federal sentences of New Square residents. *See*, Village of New Square and RICO allegations, *infra*.

88.    The power of block voting is well known (and feared) by New York politicians. The problem with the Block Vote is that it does not represents the thoughtful decision-making of individual voters, but instead represents the will of the group's leadership.

### H.  Exponential Population Growth of an Insular Group in an Otherwise Pluralistic Democracy

89.    From the YAFFED complaint, comments responding to news stories and news stories relating to the birth rates of the Hasidic community, it is fair to characterize the population growth of the Hasidic communities of Brooklyn, Rockland and Orange counties as exponential (or at least geometric).

90.    Census figures corroborate very fast growth in these communities.

---

[14] Hasidic voters certainly have the right to vote for whomever they want to vote for, or who they are asked to vote for by their Hasidic elders.  There is no argument that Government can deny the right to vote.

91.   Upon information and belief, the average adult Hasidic woman is mother to between 5 and 10 children, beginning in her late teens or early twenties.

92.   For the sake of simplicity in calculation, let's say the average Hasidic woman has 10 children in 10 years, beginning at age 20, and 5 of those children are girls.  Let's say the community consists of 100,000 adult women, in their early 20's, as of January 1, 2019 in New York State.  The population growth of Hasidic women will be as follows (and double the numbers if men are included):

| | |
|---|---|
| 2019: | 100,000 |
| 2039 | 500,000 |
| 2059 | 2.500,000 |
| 2079 | 1,250,000 |
| 2099 | 62,500,000 |
| 2119 | 312,500,000 = 625 million (men and women) |

93.   Thus, under the above very rough mathematical estimates, in less than one century, if the Hasidic community maintains its cultural or religious practice of having large families, the Hasidic population will be approximately <u>double</u> the current population of the United States.

94.   Somewhere along the line, significant problems will develop.

95.   Rapid population growth of the ultra-Orthodox population in Israel is resulting in political strife and even violence.

96.   The exponential population growth any "ultra-Orthodox" religious community (of any religion) will likely eventually result in the establishment of a theocracy, with ever-increasing influence on government along the way.   One can see this in U.S. politics today, as politicians pander to powerful religious organizations.

97.   Hasidic population growth is being perceived by non-Hasidics as a population time bomb—a time bomb that is already making many suburban neighbors to Hasidic

35

communities quite anxious about their land use expectations, their property values, their homesteads, their democracy and their future.

98.    As to population growth, the State has an interest in several respects.

99.    First, the State can help insure that women have meaningful choices over their own bodies, including child-bearing. If the woman's husband, or her religious elders, wish to coerce the women into being a baby factory, the State has the obligation to prevent such coercion, and protect the woman's personhood and right to control her own body.[15]

100.    Second, the State has an interest in ensuring that Hasidic women and men obtain a sufficient liberal secular education that upon reaching adulthood, the men and women of the Hasidic community are able to make knowing and intelligent choses about their lifestyles and family size that the parents can financially support.[16]

101.    Third, the State has an interest in fostering certain values—what might be called American Values—that are needed for a pluralistic society such as the United States to survive as a democracy. Individual freedom is a constitutionally protected value in America, but the Supreme Court's teachings have just as often centered on "ordered liberty"—that the interests of the individual must, in many cases, be balanced against the interests of the society as a whole.

---

[15] *See*, Roe v. Wade, 410 U.S. 113 (1973).

[16] The State has no requirement to defer to "religious leaders" regarding neutral rules requiring a liberal secular education of children, even if this means that some (or even most, or even all) of the children take a less "orthodox" view of their religion upon reaching majority. Religious liberty is an individual right, not an organizational right.

36

Case 1:19-cv-00035-BKS-CFH    Document 2    Filed 01/09/19    Page 37 of 105

102. Ultimately, child-bearing is a personal decision.  It should be informed not only by religious influences, but also through insights that may result from having obtained a sound liberal education.

### I.    The Insular, Non-Self-Supporting Hasidic Community

103.  The various news stories referenced in this complaint have many comments relating to conflict between Hasidic and non-Hasidic communities.

104.  When people view other people as "different," misunderstanding often results.  And when communication is difficult, conflicts may result.

105.  One observation is that the Hasidic community has intentionally sought to keep itself insular, and isolated, from non-Hasidics.   The Village of Kiryas Joel, in Orange County, appears to outsiders as if it were a village in a foreign country.  So too the Villages of New Square and Kaser in Rockland County.

106. Ethnic and cultural diversity is respected in the United States.  Diversity is an American attribute, and makes our democracy strong.

107.  However, ironically, it appears that the Hasidic community is intentionally creating what some may equate to a Ghetto for itself—a Ghetto not created by an anti-Semitic governing society, but rather a Ghetto created by the Hasidim themselves.

108.  Or call it an "enclave."  Or call it a Jewish version of the Roman Catholic Church's Vatican state.[17]  Call it whatever you like but it is clear that the Hasidic leadership is intent upon creating a self-governing religious community using many of the instruments of State power to do so, by organizing within, and using, secular government.

---

[17] *See* paragraphs 295 – 301, below, hypothesizing the Vatican's purchase of all land in the Village of Kiryas Joel.

109. This is problematic in a pluralistic society.

110. It is problematic in many respects, but most fundamentally, for the republican democracy in America's multi-cultural, religiously diverse society.

111. A pluralistic society will suffer if a segments of that society does not wish to take part. If the country becomes a collection of tribes, democracy will not work.

112. Several people have written about the Hasidic efforts to keep separate from the larger American society. *See*, *e.g.,* GRUMET & CAHER, THE CURIOUS CASE OF KIRYAS JOEL (Chicago Review Press 2016)[18]; JOSEPH BERGER, THE PIOUS ONES: THE WORLD OF HASIDIM AND THEIR BATTLES WITH AMERICA (Harper Collins 2014);[19] and HELLA WINSTON, UNCHOSEN: THE HIDDEN LIVES OF HASIDIC REBELS (Beacon Press 2005). [20]

---

[18] Jewish Book Council book review available online at:
https://www.jewishbookcouncil.org/book/the-curious-case-of-kiryas-joel

[19] Jewish Book Council book review available online at:
https://www.jewishbookcouncil.org/book/the-pious-ones-the-world-of-hasidim-and-their-battles-with-america .

[20] Jewish Book Council book review available online
at:https://www.jewishbookcouncil.org/book/unchosen-the-hidden-lives-of-hasidic-rebels As stated in this book review of UNCHOSEN:

> "Ms. Winston has accomplished no small feat in penetrating the tight-lipped communities of Satmar and other lesser known Hasidic sects. She becomes privy to the frustrations and yearnings of those tortured by Kafkaesque conflicts between the dogma of their upbringing and culture and their individual wants and needs. Hampered by a lack of secular education and an often slipshod ability to communicate in English (many of the Hasidic communities use Yiddish as a means of communicating), these "rebels" face innumerable obstacles in their effort to try to immerse themselves in a non-Hasidic world.

> Although the concept of trying to escape and reach beyond the confines of one's upbringing and family values is certainly not novel, the difficulty that the Hasidic "rebels" encounter in attempting to exit the fold appear to some to be unbearable. These individuals have been raised with a clearly articulated mantra that any challenge to the stringent religious and communal rules results in sharp condemnation and a rebuke to "get back in line." Confronted with disdain by their families and communities and threats that siblings will be unable to find suitable matches, these "rebels" often find the attempt to find meaning and purpose outside the cocoon of their communities a battle too difficult to fight successfully."

38

113. The desire for insularity raises some fundamental questions. Is it "American" for any United States citizen to find themselves unable to have personal liberty, and personal identity, in 21st Century? Do the state and federal Bill of Rights protect the individual over the group in our constitutional republic?

114. Does the Hasidic community (i.e., its leadership) have the right to oppress its members?

115. These are difficult questions. The questions would be less difficult of a greater number of the Hasidic community received a liberal, secular education.

### i. Hasidic use of Governmental entitlement programs—e.g., Medicaid, Food Stamps & Educational/College benefits

116. Some of the New York Times commentators cited above referenced Hasidic use of governmental entitlement programs at excessive rates, and otherwise burden the larger taxpaying body politic.

117. This is an apparently legitimate concern.

118. "Religion liberty" can be used both as a sword and as a shield.

119. Several commentators expressed the view that many Hasidic mothers bear more children than they can afford, and thus find it necessary to apply for various governmental entitlement or relief program, such as the aforementioned food stamps, welfare, section 8 housing and Medicare.

120. This poses a tax burden on the larger society.

121. Similarly, upon information and belief, higher education benefits such as college tax credits and deductions may be obtained for "rabbinical studies" which, it would appear, should not be granted if purely for religious study, as the First Amendment prohibits governmental sponsorship of religion.

39

Case 1:19-cv-00035-BKS-CFH   Document 2   Filed 01/09/19   Page 40 of 105

122.   These abuses of governmental entitlement programs, if they exist in a substantial way, must be addressed by government.

123.   The simplest long-term solution is an adequate, liberal secular education, where American values relating to the Golden Rule as applied to governmental benefits can be taught, learned and then observed.

124.   Upon information and belief, if a group of people have learned to "abuse the system" of the larger governing society (e.g., State law),  they can also learn to comply with the larger society's rules.

125.   In this, a liberal secular education is an answer and long-term solution.

126.   Upon information and belief, inadequate secular education has a direct relationship with the economic welfare and self-sufficiency of individual Hasidics and their communities.

ii.     **Local Yeshivas in garages and fire traps – East Ramapo Central School District**

127.   In news reports in, for example, Lohud and the Rockland County Journal News, we see examples of elementary schools in what appear to be garages or otherwise inadequate building structures.

128.   Criticism is made that fire safety and road crossing safety standards are not met.

129.   Criticism exists that secular subjects are not sufficiently taught

130.   Upon information and belief, some non-Hasidic children have been denied adequate special education services because of the action of the Hasidic-controlled school board.   This is the flip side of the problem of inadequate education of Hasidic children.

Here the Hasidic community is causing a difficulty in adequately educating the non-Hasidic public school children.

131. The East Ramapo Central School District has approximately 24,000 children who attend private school yeshivas, and approximately 8,000 children append the public schools of the district.

132. If the majority of school board members are primarily concerned with the approximately 24,000 students attending yeshivas, which the religious community must necessarily pay for in addition to paying taxes for the public school district.

133. Hasidics may ask:  If many or most of the approximately 24,000 students in yeshivas obtain a very good religious education, then why should the elected public school board (now mostly Hasidic) do anything but the bare minimum for the approximately 8,000 public school students?

134. The conflict of interest is obvious.  The situation problematic.

135. Moreover, the self-interested Hasidic school board members could[21] decide to make the public school children's education so unpleasant and so deficient that the parents of non-Hasidic school age children decide it's better to move out of (or never move into) the school district.

136. Moreover, if the public schools' educational standards are lowered, then it will be easier for the Hasidic yeshivas to meet the "substantially equal" requirement of N.Y.S. law.

137. As to the Hasidic-controlled East Ramapo school board, it is also difficult to see how this body can effectively represent the educational needs of public students when

---

[21] Plaintiff is not alleging that they do so.  Only that they could, in their Hasidic community's self-interest.

the board members know, or should know, that the education being provided in the

Hasidic yeshivas contains so much less secular education, and is so much cheaper per

student.

### J. Poor Education results in Poor municipalities and destitution

138.  The Hasidic communities, totaling almost 250,000 people in New York State

as of 2012, almost uniformly report themselves as very poor.  According to the Jewish

newspaper Forward:

> "Poverty rates are high among … older Jews, and among the Orthodox.
> Hasidic Jews are the poorest Orthodox group – a full 43% of Hasidic
> households qualify as poor."[22]

139.  Upon information and belief, it is unknown to the undersigned whether this is

actual poverty, or fake poverty, as acute poverty is not apparent from the outward

appearance of many Hasidic communities.

### i.  Extreme Poverty in the Village of New Square

140.  It is reported that the exclusively Hasidic community of New Square, located

about 23 miles north of New York City in Rockland County,  is the poorest municipality

in New York State,[23] with the lowest per capital income and 72 percent of its population

below the poverty line, with about two-thirds of its families receiving food stamps and

Medicaid.

141.  Informative is this description from Wikipedia:[24]

---

[22] *See* Forward story *N.Y. Jewish Population Grows to 1.5M: Study, June 12, 2012,* available
online at https://forward.com/news/157654/ny-jewish-population-grows-to-15m-study/

[23] *See, e.g.,* Rockland Journal News story *New Square ranked as New York's poorest
municipality*, May 10, 2018, available online at:
https://www.lohud.com/story/news/local/rockland/2018/05/09/new-square-ranked-poorest-municipality-new-york-state/591434002/

[24] Webpage found at https://en.wikipedia.org/wiki/New_Square,_New_York (and viewed on
December 5, 2018).

42

**"Culture**

The community in New Square is made up exclusively of Hasidic Jews, mostly from the Skverer Hasidic movement, who wish to maintain a Hasidic lifestyle while keeping outside influences to a minimum. The predominant language spoken in New Square is Yiddish.

People typically marry around 18 to 20 years of age. Girls finish high school at around age 17 and then marry. Custom dictates that women who marry men from other Hasidic communities leave New Square. Some women who left New Square settled in the Borough Park community in Brooklyn and the Monsey community in Ramapo, where the community is not as tightly knit. Men who marry women from outside of the community are encouraged to leave New Square. This is due to a shortage of space, thus new housing is granted to couples of which both members are from the community.

In 2005 the community's rabbinical court ruled that women should not operate cars.  In a 2003 article Lisa W. Foderaro of The New York Times described New Square as "extremely insular" and said that the community's residents do not own televisions or radios.

**Economy**

Young women, prior to entering marriage and before they have children, work as teachers, secretaries, and bookkeepers, or they work in the New Square shopping center as cashiers and clerks. Some of the women, after having children, work as bookkeepers in their homes.

Young men work as teachers, bus drivers, deliverymen, and store clerks. Some work as computer programmers or as craftsmen and entrepreneurs in the diamond industry. Many study in the kollel, a yeshiva for married men, and receive stipends to support their families.

In 1970 the village had the lowest per capita income in New York State. In 1963 four persons received welfare due to illness. One dozen people received welfare in 1975. In 1992 the village administrator said that in 1975 about two thirds of the families received food stamps and Medicaid.

According to the 2000 census, the median income for a household in the village was $12,162, and the median income for a family was $12,208. Males had a median income of $21,696 versus $29,375 for females. The per capita income for the village was $5,237. About 67.0% of families and 72.5% of the population were below the poverty line, including 77.3% of those under age 18 and 14.7% of those age 65 or over.

2007 and 2008 reports from the State of New York stated that 89.8% of the village consisted of low-income and moderate-income residents."

142. In Rockland County, the villages of New Square and Kaser are essentially Hasidic-governed municipalities.

143. Both are reported to be very impoverished. As such, the villagers receive a significant amount of governmental financial aid.

144. Thus, the people do not appear to be self-supporting. And thus the need for better secular education to prepare them for economic self-sufficiency.

145. It appears that monetary benefits are not limited to governmental entitlements.

146. For example, jin 1999, four men from New Square were convicted of a $30 million fraud concerning a nonexistent yeshiva, apparently with some, or perhaps much, of the proceeds of the crime returning to the New Square Hasidic community.

147. This resulted in a controversy concerning the possibility that President Clinton commuted the four New Square residents' federal sentences because New Square's voters "block voted" for Hilary Clinton in her race for the U.S. Senate in 2000 (which was odd, since the other Hasidic communities in Rockland voted for the Republican that year).

148. Tainted money and political influence. Problems that might not be found if the Hasidic population was better educated, and thus better able to provide for itself economically.

   ii.   **Population Explosion in the Village of Kiryas Joel & becoming the "First Jewish Town" in the United States—the Town of Palm Tree**

149. An increasing population size merely compounds the problems of poverty.

150. A rapidly growing Hasidic community located in Orange County, about 20 miles north of New Square, is the village of Kiryas Joel (colloquially referred to as "KJ").

151. A brief summary of KJ's history is this:

44

Case 1:19-cv-00035-BKS-CFH   Document 2   Filed 01/09/19   Page 45 of 105

"Kiryas Joel is named for the late Rabbi Joel Teitelbaum, the rebbe of Satmar and driving spirit behind the project. Teitelbaum himself helped select the location a few years before his death in 1979. Joel Teitelbaum, originally from Hungary, was the rebbe who rebuilt the Satmar Hasidic dynasty in the years following World War II. The Satmar hasidim who established Kiryas Joel came from Satu Mare, Romania, known when under Hungarian rule as Szatmár.

In 1947, Teitelbaum originally settled with his followers in the Williamsburg section of Brooklyn, a borough of New York City. By the 1970s, however, he decided to move the growing community to a location that was not far from the commercial center of New York but was also more secluded from what he saw as the harmful influences and immorality of the outside world. Teitelbaum's choice was Monroe. The land for Kiryas Joel was purchased in the early 1970s, and fourteen Satmar families settled there in the summer of 1974. When he died in 1979, Teitelbaum was the first person to be buried in the town's cemetery. His funeral reportedly brought over 100,000 mourners to Kiryas Joel." [25]

152. Another general description of the Village of Kiryas Joel is found in the

N.Y.S. Court of Appeals case, *Matter of Congregation Yetev Lev D'Satmar v. Kahana*, 9

N.Y.3d 282 (2007).

153. And the U.S. Second Circuit described it as follows:

"The Village of Kiryas Joel (the "Village") was incorporated in 1977 to serve as an enclave for followers of the Satmar Hasidic sect of Judaism. The Village is populated exclusively by followers of that sect, a majority of whom are members of defendant Congregation Yetev Lev D'Satmar of Kiryas Joel ("Congregation Yetev"). Plaintiffs are also followers of the Satmar Hasidic faith, but do not accept the legitimacy of Congregation Yetev's current leader, the Grand Rebbe, Aron Teitelbaum, a relative of the original leader of the sect. Plaintiffs contend that because of their refusal to accept the current Grand Rebbe, they and other "dissidents" have been discriminated against in several ways by the Village, which, they allege, is run entirely by members of Congregation Yetev."

*See, Kiryas Joel Alliance v. Vill. of Kiryas Joel,* 495 F. App'x 183, 187 (2d Cir. 2012).

154. The Village has been involved in several high profile court cases where

religious insularity has been at issue to various degrees, perhaps most significantly the

---

[25] Webpage found at https://en.wikipedia.org/wiki/Kiryas_Joel,_New_York (and viewed on December 5, 2018).

Supreme Court case *Kiryas Joel Village School District v. Grumet,* 512 U.S. 687 (1994).

The Supreme Court's opinion gave an informative summary in the Syllabus:

> "The New York village of Kiryas Joel is a religious enclave of Satmar
> Hasidim, practitioners of a strict form of Judaism. Its incorporators
> intentionally drew its boundaries under the State's general village
> incorporation law to exclude all but Satmars. The village fell within the
> Monroe-Woodbury Central School District until a special state statute,
> 1989 N. Y. Laws, ch. 748, carved out a separate district that follows
> village lines. Although the statute gives a locally elected school board
> plenary authority over primary and secondary education in the village, the
> board currently runs only a special education program for handicapped
> children; other village children attend private religious schools, which do
> not offer special educational services. Shortly before the new district
> began operations, respondents and others brought this action claiming,
> inter alia, that Chapter 748 violates the Establishment Clause of the First
> Amendment. The state trial court granted summary judgment for
> respondents, and both the intermediate appellate court and the New York
> Court of Appeals affirmed, ruling that Chapter 748's primary effect was
> impermissibly to advance religion."

155. A book has been written on this subject, about the secretive formation of KJ's

public school system. As the NY Times book reviewer Sam Roberts writes about the

book GRUMET & CAHER, THE CURIOUS CASE OF KIRYAS JOEL (Chicago Review Press

2016) as follows:

> "The authors recount how Democrats in Brooklyn, where the Satmar sect
> is based; George E. Pataki, then a Republican assemblyman in the Hudson
> Valley who was wooing the Hasidim, who vote as a bloc; and Gov. Mario
> M. Cuomo worked to establish "the first governmental unit in American
> history that was created solely to serve the needs and interests of only one
> religious group" — certain that the courts would overturn their largess.
>
> "As sure as I'm sitting here," said Mel Miller, then the Assembly speaker,
> "I thought it was going to be vetoed, and if not vetoed then knocked out by
> the courts. Sometimes you make these political calculations — it's just
> politics."
>
> Mr. Cuomo rationalized. "It's just a school for 13 poor, retarded
> immigrant children," the authors quote him as saying. "Who's going to
> sue?" he added. Mr. Grumet, executive director of the New York State
> School Board Association, did."[26]

---

[26] *See,* NY Times article *The Hasidim and the Cynical Politicians*, May 29, 2016, Page MB3 ,

156. According to the U.S. Census, only 6.3% of KJ village residents speak only English at home, with 46% speaking English "not well" or "not at all."[27]

157. KJ's population was 500 at its founding in 1977, and is rapidly growing, with 13,138 in 2000, and then 20,175 in 2010, and an estimated 24,155 in 2017.[28]

158. According to the U.S. Census Bureau, Kiryas Joel has the youngest median age population of any municipality in the United States, with reported rapid population growth.

159. According to the 2008 U.S. Census, it also has the highest poverty rate in the Nation, with two thirds of residents living below the federal poverty line.

160. According to Wikipedia, 40% of KJ residents receive food stamps.

161. In 2019, the Village of Kiryas Joel will become the Town of Palm Tree.  It will be an established religious community, in a Nation whose constitution prohibits the establishment of religion in government.

162. As reported by the Cleveland Jewish News, regarding what may be the first "Jewish town" in the United States:

> "The Hasidic community of Kiryas Joel reportedly will become the first haredi Orthodox town in the United States after voters in Monroe, New York, overwhelmingly backed a referendum on secession.
>
> On Tuesday, over 80 percent of Monroe voters backed the measure on Kiryas Joel, a village of over 20,000 Yiddish-speaking Jews associated with the Satmar Hasidic sect, to form the state's first

---

available online at https://www.nytimes.com/2016/05/29/nyregion/the-hasidic-school-district-that-was-created-in-secret.html; *see also*, Jewish Book Council book review available online at: https://www.jewishbookcouncil.org/book/the-curious-case-of-kiryas-joel.

[27] *Id*.

[28] *Id*.

> new town in 35 years. The Town of Palm Tree — an English
> translation of the Satmar rebbe's surname, Teitelbaum — should
> come into existence in 2020, unless lawmakers speed up the
> process. ***" [29]

163.  Upon information and belief, this may be the first municipality in the United

States consisting exclusively of and governed by individuals of a single ultra-orthodox

religion (Christian, Jewish or otherwise).

164.  Upon information and belief, a substantial impetus for the creation of this new

Hasidic-centric town was housing needs for its rapidly expanding Hasidic population, and

the desires of the Hasidic leadership.

165.  Upon information and belief, similar housing needs for Hasidics are found in

neighboring Rockland County, as indicated by following:

> ➢ Rockland County, NY added 547 housing units last year, trailing
> only Orange and Nassau counties among suburbs in New York,
> according to census data.   This is in contrast to Westchester
> County, which had 63 new housing units last year, and Putnam
> County, which had 18.

166.  As reported by the New York Times:

> "Because of the sheer size of the families (the average household here has
> six people, but it is <u>not uncommon for couples to have 8 or 10 children</u>),
> and because a vast majority of households subsist on only one salary, 62
> percent of the local families live below poverty level and rely heavily on
> public assistance [government welfare], which is another sore point among
> those who live in neighboring communities. [30]  (*emphasis added*)

---

[29] Available online at : https://www.clevelandjewishnews.com/jta/ny-town-votes-to-let-orthodox-enclave-kiryas-joel-secede/article_22821983-76f7-5fd7-b47b-8a8992c539c7.html

[30] "Reverberations of a Baby Boom" by Fernanda Santos, The New York Times, August 27,
2006, retrieved December 5, 2018; accessed online at
https://www.nytimes.com/2006/08/27/nyregion/27orange.html?pagewanted=1&th&emc=th.

48

167. The rapid growth of KJ, and the accompanying need for resources and feared suburban sprawl, has distressed people in neighboring communities. Land use regulation has become a center of conflict.[31]

168. As to all of the above discussion, the one constant is that the KJ children receive, upon information and belief, very little secular education. Instead, they receive a "traditional" religious education that may have been suitable for exclusively religious study in 19th Century Hungary, but not suitable at all for earning a living in 21st Century New York.

169. An adequate, liberal secular education is needed in 21st Century America, so that the community's children, upon reaching majority, can as individual decide what cultural norms they wish to follow, and not be dependent upon public assistance programs.

170. Lifestyle desires in the United States also dictate land use (e.g. zoning) preferences.

171. Land use conflict becoming problematic regarding Hasidic movement into non-Hasidic communities.   Some examples of conflict are discussed below.

### iii.   Hasidics sue the small Village of Airmont for $25 million

172. Land use regulation (e.g., zoning and subdivision rules) is designed for the health, safety and welfare of a community. In New York State, land use regulation is generally at the village and town level. Villages are often formed when the residents of portion of a town decide that they would like land use regulation that fits preferences that are different from that of the town.

---

[31] *See, Wikipedia page, supra note 25.*

173. Land use regulation is ordinarily governmental in nature, but can also involve non-governmental action, such as a developer's imposition of restrictive covenants on the development's lots.

174. It is unlawful to discriminate against home purchasers on the grounds of, for example, race, or religion.

175. However, regulations that are of general application and neutral should not ordinarily be legally suspect.

176. Problems arise when the use of property is objectionable to some people, but desired by others who view the use as necessary for their exercise of their religious belief.

177. For example, parking and fire hazard concerns may make it unsafe or otherwise inappropriate for a 2,000 square foot residential building to hold more than 50 people, yet the homeowner may desire to host events with over 50 people that include, for example, a) with family or b) with religious co-worshipers.

178. A neutral, non-discriminatory law should be upheld against a § 1983 or Fair Housing Act challenge regardless of whether the super-sized gathering is of a) family or b) co-worshippers.

179. Additional protection for organized religion has been granted by Congress in the form of the Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc, *et seq*., The constitutionality of this pro-religion federal statute remains a subject of debate.

180. In the small Village of Airmont (consisting of under 9,000 residents), the Hasidic community has been at odds with the non-Hasidic village resident since the

50

Case 1:19-cv-00035-BKS-CFH    Document 2    Filed 01/09/19    Page 51 of 105

Village's formation in 1991. *See*, *e.g., Leblanc-Sternberg v. Fletcher*, 67 F. 3d 412 (2d

Cir. 1995).

181.  In 2005, a yeshiva and boarding school was proposed for several hundred

individuals on 19 acres of land (including 70 adult students), which the local residents

opposed, result in another lawsuit and settlement.  (500 residents on 29 acres equals

around 26 residents per acres, which would be far above the zoned residential density.)

A settlement was reached in 2011, to allow a school with student housing.

182.  On November 28, 2018, approximately 31 plaintiffs sued the Village in the

U.S. District Court (SDNY), in order to:

> "stop pervasive, government-sponsored religious discrimination…. in a
> coordinated and concerted effort, are engaged in yet another conspiracy to
> prevent Hasidic Jews from operating a private religious school to serve the
> educational needs of the surrounding Hasidic Jewish community."[32]

183.  The plaintiffs are reportedly seeking damages of $25 million for the village's

allegedly "anti-Sematic" conduct.  The Plaintiffs are represented by the powerful,

politically connected law firm of Whiteman Osterman & Hanna LLP and the pro-

religious liberty law firm First Liberty Institute.

184.  From what is available from news sources, it appears that one argument that

the non-Hasidic residents are making is that their desired rustic, sleepy, tranquil bedroom

community is being invaded by a group of people (religion being of no concern) that

desire much more intensive use of land than what the villagers envisioned when they

incorporated the village.

---

[32] *Central UTA of Monsey et al v. Village of Airmont, et al*, No. 18-11103, at page 3, ¶ 1.

51

185. Thus, the villagers are saying, essentially, " we don't care if you are Afro-American, Buddhist, Christian or Jew, we only care that the streets remain uncongested and the living environment peaceful.

186. The plaintiffs are saying "we pose no threat, and you are obstructing us only because of our ultra-orthodox religion."

187. The true legal problem is likely much more complicated, and problematic.  It includes the question of the proper scope and authority of land use regulation by local authorities, and the proper (if proper) role of the State in influencing cultural characteristics (but not religious beliefs) of any particular group of people.

188. Cultural differences are a part of the difficulty.  As the New York Times wrote in an informative story in 1997:

> "Common to all the issues are collisions between inflexible government rules and inflexible mores of an unconventional community, many of whose members speak only Yiddish and bring a visceral distrust of authority born of the Holocaust and despotic European regimes.[33]

189. The likely concern—and a legitimate concern—is that the exponentially-growing Hasidic population will bust the seams of Brooklyn (especially the Williamsburg, Crown Heights and Borough Park communities) and relocate to a target locale, for example, the Village of Airmont, just has a large number of Hasidic relocated to Rockland County (and within Rockland, the Villages of New Square and Kaser, and the hamlet of Monsey).

---

[33] *See*, New York Times story "J. Berger, Growing Pains for a Rural Hasidic Enclave, Jan. 13, 1997, available online at https://www.nytimes.com/1997/01/13/nyregion/growing-pains-for-a-rural-hasidic-enclave.html .

52

190.    The answer—again—in secular education of Hasidic children, as this will reduce its population explosion and allow for better dialogue with people of differing cultural and religious heritage.

### iv.    Village of Pomona, the proposed "Rabbinical College," and a $6 million+ potential attorney fee exposure

191. The Village of Pomona, New York, appears to be in a legal battle that could economically traumatize a citizenry that says it wishes a peaceful village with a rustic environment.  Is religious discrimination afoot here, or is religion being used as a legal sword to grab land for an expanding Hasidic population?

192. The Rabbinical College of Tartikov, Inc. ("Tartikov") is a Hasidic group that desired to build what Village officials characterized as a "rabbinical college extraordinaire" within the Village of Pomona, in Rockland County.[34]

193. Tartikov alleged religious discrimination.  The Village asserted that its land use controls were designed to protect the rural character of the village and protect against overburdening the village's infrastructure.

194. The U.S. District Court ruled that the village was discriminating against Tartikov's proposed rabbinical college on the basis of religion.

195. There would be no doubt that the village or its inhabitants were discriminating against Hasidics if a Hasidic family attempted to purchase a home in the village but were prevented from doing so on account of their religion.

---

[34] For an article describing the litigation, *see A. Guardino, Village Discriminated against Proposed Rabbinical College*, NY Law Journal, March 28, 2018, article available online at http://www.farrellfritz.com/wp-content/uploads/ASG-Village-Discriminated-Against-Proposed-Rabbinical-College.pdf; *see also*, *Congregation Rabbinical College of Tartikov v. Village of Pomona* (S.D.N.Y. 2017), appeal pending.

53

Case 1:19-cv-00035-BKS-CFH   Document 2   Filed 01/09/19   Page 54 of 105

196. Likewise, there would be no doubt about unlawful discrimination if Tartikov was purchasing an existing Roman Catholic , Protestant or Muslim religious college, with existing housing for students and families, but were denied because the villagers did not want Hasidics.

197. However, if the Village elected officials, as a matter of local democracy, decided that the density of use proposed by Tartikov was too great, this is not religious discrimination, but rather is democracy deciding local land use.   Respectfully, the District Court likely "got it wrong."   (The case is currently on appeal to the U.S. Second Circuit.)

198. What if, for example, Tartikov was not a Church-affiliated organization but a non-religious not-for-profit organization seeking approval for a technology college?  If such an application could be denied as a land use out of character with the village' democratically-determined land use desires, why should it be denied and Tartikov's granted?  Isn't the not-for-profit thereby denied the equal protection of the laws, and isn't the State acting in a manner that is favoring (establishing) religion?

199. To what extent can a religious group use religion as a sword to obtain preferential treatment?  The answer should be that it cannot, yet that seems to be what Tartikov is obtaining from the District Court in this case—preferential treatment because it is Church-affiliated.

200. Plaintiffs presume that the Hasidic leadership is very smart, and is playing the "long game."

201.  What the long game could mean regarding the Village of Pomona is that
Tartikov gets its college/housing approvals, recovers $6+ million in attorneys' fees [35]
from the Village's taxpayers (a very substantial burden, since the village has a population
of only around 3,100 residents), and then engages in a simple strategy for taking over the
village—buy houses in the village (with or without the tactic of "block-busting" [36]),
eventually take over the village board, and eventually occupy the entire village, to create
another Hasidic-controlled, Hasidic-governed village.

202.  And with such a Hasidic municipal takeover, what about the rights of the non-
Hasidics, whose property values plummet as the character of the village is changed from
single family/low density/rural to high density/ multi-family/urban housing, where the
public school district will also be negatively impacted by a Hasidic preference for
Hasidic yeshivas?

203.  The answer, notwithstanding arguments that the above scenario represents an
unconstitutional "establishment of religion" in contravention of the Establishment Clause
of the First Amendment is most likely "too bad."  Citizen, Hasidic and non-Hasidic alike,
have the right to live where they want, to vote for whomever they choose, to enact land
use and public school educational policy that complies with what is required by the law,
and no more.  Thus, if the Hasidic leadership wishes to take over Pomona, they will.

---

[35] Tartikov is presently seeking $5.2 million in attorney's fees against the Village, and will be
entitled to fees on appeal if it prevails. *See*, Journal News story, Lieberman, Tartikov Seeks
$5.2M in fee reimbursement from Pomona, August 6, 2018, available online at:
https://www.lohud.com/story/news/local/rockland/2018/08/06/tartikov-seeks-5-2-m-legal-fees-
pomona/897407002/.  This sum will amount to about $6,700 for every Village household (if 4
per household).

[36] *See, e.g., R*ockland Journal News editorial *'Blockbusting' probe an important step in Rockland,*
Sept. 16, 2016, available online at:
https://www.lohud.com/story/opinion/editorials/2016/09/16/blockbusting-probe-
rockland/90420058/.

204. And by the force of numbers—the reality of unchecked exponential growth summarized in ¶ 92 above, any group (religious or not) with exponential population growth will be able to democratically take over the government. It is a simple mathematical certainty combined with the right to vote.

205. There is only one constitutional, democratic solution. It is the solution that is the purpose of this lawsuit. The State of New York must compel a liberal secular education for all children who reside in the State, including children attending Hasidic yeshivas or home-schooled by Hasidic parents. The education may (and hopefully will) alter cultural norms that are detrimental to the larger society (e.g., the cultural norm of Hasidic women being largely subservient to their husbands and their religious leaders, especially with regard to child-bearing and family size[37]).

206. Compulsory secular education is needed.

### v. The Town of Ramapo, and East Ramapo Central School District

207. The exploding ultra-Orthodox population in the Town of Ramapo, and the problems being experienced in the East Ramapo Central School District, are so severe that a State monitor was appointed.

208. Both school and land use issues relating to the Town of Ramapo and the Hasidic community have been widely reported by the Rockland County Journal News. [38]

---

[37] The religion can promote childbirth—both Hasidic and Roman Catholic church doctrine seek large families. However, secular law allow the woman the right to control her own body, and to make child-bearing choices. Education is key to women making informed, intelligent choices.

[38] See, e.g., Journal News Special Report, RAMAPO NEARS BREAKING POINT--AS THE ULTRA-RELIGIOUS COMMUNITY GROWS, RAMAPO BECOMES A FLASH POINT IN CONFLICT OVER WHAT IT MEANS TO BE SUBURBAN, Jan. 13, 2017, available online at: https://www.lohud.com/story/news/local/rockland/ramapo/2017/01/08/ramapo-ny-breaking-point/95369994/

56

209. The villages of New Square, Kaser and a substantial portion of Pomona are located in Rockland County.

210. The lack of a sound, secular education of the children attending Hasidic yeshivas in Rockland County is, upon information and belief, creating a population growth time bomb for this suburban county.

211. And the only effective and constitutional way to address the problem, upon information and belief, is by requiring sound, liberal, secular education of all New York's children.

### vi.     The Town of Mamakating and the Village of Bloomingburg

212. The Hasidic community is apparently expanding into the very small Village of Bloomingburg, in Sullivan County, New York.[39]

213. The FBI is reported to have arrested three men in connection with conspiring to corrupt the village's elections, in a pro-Hasidic manner. [40]

### vii.    The New Jersey Township of Lakewood, Tom's River and Jersey City

214. Although not located in New York State, migration from Brooklyn's Hasidic communities have resulted in the rapid growth of the New Jersey municipalities of Lakewood, Jersey City and Tom's River.  Problems appear similar to those of Orange and Rockland counties.

215. As described by the New York Times:

---

[39] *See*, FORWARD news story *How the Hasids Won the Battle of Bloomingburg - and Everyone Else Lost*, December 15, 2016, available online at: https://forward.com/news/357030/how-the-hasids-won-the-battle-of-bloomingburg-and-everyone-else-lost/ .

[40] *See*, FORWARD news story *Hasidic Bloomingburg Is Still Growing, Even After F.B.I. Arrests Its Builder*, April, 7, 2017, available online at  https://forward.com/news/368459/hasidic-yeshiva-opens-in-bloomingburg-months-after-fbi-arrests/.

57

"Between 1990 and 2010, Lakewood's population doubled to about 92,000 residents, largely because of the growth of its ultra-Orthodox Jewish community. Conveniently located equidistant from New York City and Philadelphia, Lakewood is home to Beth Medrash Govoha, the nation's largest yeshiva. The school, founded in 1943 by the refugee Rabbi Aharon Kotler, has seen its student body swell to about 6,500, making it just smaller than Harvard College. The growing Orthodox movement encourages young men to forgo or postpone higher education for religious study, and the yeshiva has benefited from that. Other schools have followed suit, setting up shop in Lakewood. Most students are married, and families with five or 10 children are common.

Numbers like these have helped the American Orthodox community explode in recent years."[41]

216. As reported by the Los Angeles Times, the township has swelled into becoming one of the largest concentrations of ultra-Orthodox Jews outside of Israel.[42]

217. Presumably it is a close nit Hasidic community, with its children educated in a similar manner.

218. Thus, one might wonder about Hasidic leadership knowledge, or even involvement, regarding a series of well-publicized raids that since late June 2017 have netted 26 suspects on charges of stealing $2 million in government benefits.[43] *See also*, RICO cause of action, *infra*.

219. As reported by the LA Times:

[The ultra-Orthodox] are a fast-growing population with a high birthrate; the population of Lakewood has exploded from 45,000 in 1990 to more than 100,000 today. Many of the newcomers are from large families priced out of Brooklyn by gentrification."[44]

---

[41] *See*, NY Times article *The Beggars of Lakewood*, Oct. 16, 2014, available online at: https://www.nytimes.com/2014/10/19/magazine/the-beggars-of-lakewood.html

[42] *See*, Los Angeles Times article *Raids in New Jersey town target ultra-Orthodox Jews accused of welfare fraud. 'What is going on here?'*, Sept. 23, 2017, available online at https://www.latimes.com/nation/la-na-new-jersey-orthodox-20170923-story.html.

[43] *Id.*

[44] *Id.*

58

220. The article goes on:

> "In Lakewood, 65,000 people — more than half the town's population — are on Medicaid, the government health program for low-income families, according to state data. Lakewood has more children with two parents receiving government benefits than any other municipality in New Jersey, including large, chronically depressed cities such as Newark and Camden. A report by the Asbury Park Press found that Lakewood had received 14% of the money from a $34-million state fund for catastrophic illnesses in children, despite having only 2% of the state's children. It also found that the town had 29 times more grant recipients than any other town in New Jersey.  In 2015, the New Jersey state controller's office flagged the disproportionate sums of government money being absorbed by Lakewood. The town didn't look poor by any conventional yardsticks of poverty."[45] (*emphasis added*)

221. And then the article quotes the lead prosecutor,  Joseph Coronato, of  Ocean County prosecutor:

> "You have a family or six or seven or eight, somebody is paying the mortgage, somebody is paying the taxes, they have two cars in the driveway, they've got food for all the kids … and they're reporting their total income at $10,000.  You have to ask — what is going on here?" [46]

222. What may be going on here, upon information and belief, is an insular group's teachings, to its children and its adults, that are contrary to the needs of an ordered society respecting the rights of all.

223. In elections, the Lakewood Hasidics vote as a single block, the newspaper reports.  This gives it extraordinary political influence, which the leadership controls, not the individual citizens.

224. Again, the answer, at least in substantial part, is requiring a sound secular education  that instructs on topics such as science, history, civics and the responsibilities of citizenship.

---

[45] *Id*.

[46] *Id*.

Jersey City & Tom's River, NJ

225. Sound secular education, upon information and belief, is a cultural not a

religious objection. For example, as reported by the New York Times, Brooklyn

Hasidics are migrating to Jersey City, NJ, as the housing is more affordable. [47]  As to

Jersey City residents' concerns, the Times writes:

> "Underlying the objections of many municipalities is an often unspoken
> worry that ultra-Orthodox Jews will transform the character of their
> communities. The ultra-Orthodox may not explicitly raise the specter of
> anti-Semitism, but they do see a bias against their unconventional lifestyle,
> modest dress and customs. Orthodox Jews, in general, live in tight-knit
> communities because of their need to cluster around an infrastructure that
> includes a synagogue within walking distance, kosher butchers, yeshivas
> for boys and girls, and ritual baths." (*emphasis added*) [48]

226. If cultural differences and conflict are the problem, secular education is the

solution with no Free Exercise clause impediment.

227. The Brooklyn migration to New Jersey has also been reported as seeming to

some like "an invasion" (which comment was objected to as anti-Semitic).

Notwithstanding, the news report suggests that Hasidic "block-busting" was being

attempted by some realtors on behalf of potential Hasidic purchasers:

> "One resident, James Jackson, said he was working outside his home last
> fall when he was unexpectedly approached by the man in the black suit.
> The encounter was initially cordial but turned darker, he said.
> Jackson says he told the man he did not want to sell his home, but thanked
> him for his interest – but the man put his hand on Jackson's shoulder and
> told him he might want to reconsider.
> Many of his neighbors in Toms River, the man said, already planned to
> sell to Jewish buyers like those he represented.

---

[47] *See*, NY Times article *Uneasy Welcome as Ultra-Orthodox Jews Extend Beyond New York*,
Aug. 2, 2017, available online at: https://www.nytimes.com/2017/08/02/nyregion/ultra-orthodox-jews-hasidim-new-jersey.html

[48] *Id*.

60

'He asked me why I would want to live in a Hasidic neighborhood if I wasn't Hasidic,' Jackson recalled. 'He asked if I would really be happy, if it would be in my family's best interests.'
'He was trying to intimidate me, but not in a physical way,' Jackson said. 'He was playing mind games, and he was really good at it.'"[49]

228. Block-busting refers to real estate profiteering, by attempting to scare homeowners into selling and lower price out of fear that undesirable purchaser will take over the "block."

229. A major difference between block-busting before and at the start of the Civil Rights era, and Hasidic block-busting is this: Historically, block-busting in the United States involved white real estate brokers profiting by scaring racially biased whites into fearing the arrival of blacks. Racism alone was at work, was the land use (zoning) generally remained unchanged. Afro-Americans, upon information and belief, generally played no part in the realtor's scheme.

230. The Hasidic community, in contrast, is controlled from the top and very organized. The Hasidic leadership undoubtedly informs its members of suitable locales to move to, and it is more than likely that the potential purchaser and real estate broker work cooperatively to obtain the lowest cost purchase—in other words, attempt to influence potential sellers into selling for a low price. Well known "block-busting" tactics may be employed for this purpose. Whether or not such tactics become acts of illegality, or even criminality, is a proper subject for State Attorney General review (and

---

[49] As reported by the DailyMail.com, in the *'It's an invasion': Mayor of New Jersey town claims Orthodox Jews are trying to take over*….", March 14, 2016, available online at: https://www.dailymail.co.uk/news/article-3491782/It-s-invasion-Mayor-New-Jersey-town-claims-Orthodox-Jews-trying-residents-claim-aggressive-realtors-trying-bully-homes.html.

61

possible U.S. Attorney exploration, for example, regarding possible violation of RICO or the Hobbs Act).[50]

231.    Another significant difference is that if local residents are fearful of Hasidics moving into their town or village, this would more likely be the residents' perceptions regarding the Hasidics' cultural values and land use expectations, and have very little or nothing to do with their Jewish religion.  This complaint describes many, many different problems, or perceived problems, related to insular Hasidic communities, none of which deal with Hasidic religious belief, and all of which deal with Hasidic behaviors.

232.    It appears that some Hasidic leaders quickly label a non-Hasidic (even Jews) as "anti-Semitic" as a ploy, with the accusation intended to prevent or silence opponents or potential opponents of what might be viewed as Hasidic cultural behaviors.  Thus leveling legitimate criticism (for example, alleged Hasidic cultural acceptance of fraud upon the governmental; Hasidic insularity; Hasidic leadership's disdain for secular education; and family size beyond the parents' financial means) may be dismissed as anti-Semitic, to avoid discussing whether there is any merit to the criticism.

233.    Accordingly, in Tom's River and Jersey City, the local residents might have legitimate concerns that a sudden increase in population might adversely affect their legitimate land use expectations.

234.    The Hasidic leadership could address some of these concerns.

235.    One way of doing so would be for the Hasidic community to ensure the local residents that Hasidics will be good neighbors, where Hasidic and non-Hasidic children can play together, and even if they don't go to the same schools, there will at least be

---

[50] *See*, RICO discussion, below.

given assurance that the Hasidic children will receive a sound, liberal, secular education in their yeshiva, so that when the children do play together, they will have mutual things to talk about—things that all Americans should be able to talk about, even if only the weather.

236. This does not seem to be too much to ask. Central, again, is the sound secular education.

### K. The Radical, Insular Hasidic culture is a threat to liberal democracy

237. America was built on the idea of rational thought, democracy and individual liberty within a system of ordered freedom. America fundamental values are anti-authoritarian values.

238. The Hasidic community is religiously authoritarian, which translates into governmental authoritarianism when the village or town government become Hasidic-controlled. Authoritarian control, even if dressed up as representative democracy in a Hasidic-controlled municipality, is in multitudinous respects hostile to what America stands for—*E pluribus unum*—out of many one.

239. Religious insularity and authoritarianism teaches subservience to the religious hierarchy. It is paternalistic and male-centric. Of course, this is similar to, for example, the Roman Catholic Church or other hierarchical Churches.

240. Yet the Hasidic sect is exceptional in its behaviors in America—perhaps most prominently 1) its insularity, 2) its exponential population increase and 3) its overpowering (for most) control of its members.

241. The first two behaviors are problematic, arguably un-American, but not unlawful. The third behavior—the oppressive control of its members, and oppressive

control to the point of educational neglect and psychological abuse of its children, is certainly un-American and also unlawful, in two major respects.

242. First, the Hasidic individual must yield to the Hasidic leadership—individual freedom must yield to the religious sect's commands. However, in our country, it is the individual's decision whether or not to believe, and what to believe. Whether a huge church (e.g., the Roman Catholic Church) or a cult, the First Amendment protects the individual not the Church. True, Americans have First Amendment associational rights. But all Bill of Rights protections are individual,[51] and anticipate that an informed, educated person will ordinarily exercise such right. If the individual does not receive a sound, liberal secular education, he or she cannot exercise the constitutional right to believe in a religion of his or her choice or to associate with religious people of his or her choice.

243. Hitler pandered his MEIN KAMPF misinformation to an intelligent yet vulnerable population and the result was Nazi Germany and WW II. Lenin and Stalin likewise propagated ideas about communism to the detriment of the Russian people. The Religious Wars of Europe between Catholics and Protestants were epic, even to recent years (Northern Ireland). And southerners in the United States pandered and rationalized their ideas about racial inferiority. In other words—very intelligent people can believe very bad religious or quasi-religious ideas. The results too often are catastrophic.

244. The Hasidic leadership demands insularity. It demands secular ignorance in its children. These are very bad ideas.

---

[51] With the possible exception of First Amendment freedom of the press.

245. As to adult Hasidics who voluntarily agree to remain in a Hasidic community isolated from the rest of American society, this is their free choice as individuals.[52] However, Hasidic children who are not provided with a basic education are not able to make a knowing, intelligent choice upon reaching age 18.  How many 18 year old "Hitler Youth" Germans in 1939 did not truly believe that Hitler and Nazism were not best for them and their country?  Few.  And that is the power of indoctrination.

246. New York's children have the right to a sound, liberal, secular education—to learn about Nazism, American slavery, the rise of western (and eastern) civilizations, about chemistry, biology, human reproduction, cultural diversity, evolution, technology, astronomy and math.  To learn about systems of government and how democracy is (arguably) the best system of government, if only we can figure out how to keep it.   In contrast, for Hasidic children in Talmud-centric yeshivas to learn only about religious topics for 9 - 12 hours a day is not a means of producing a good American or New York citizens or an educated person.  The Talmudic teachings may be rigorous, and morally sound.  But these are children. If they are given only the restricted information of their orthodoxy, the result will be restricted thought—essentially mind control.

247. The State has an obligation to protect all children against harm, and cloistering children in Hasidic yeshivas where they only learn what the Hasidic hierarchy wants them to learn, and not learn what they need to learn to be able to make rational decisions about their lives when they become adults, about what to believe, and about

---

[52] YAFFED would argue that it is not a knowing and intelligent choice, and thus not a free choice, because the adult's childhood education was too inadequate, and the Hasidic leadership's control too strong, to allow for a voluntary choice.

whether and how to participate in the larger society is wrong (and amounts to educational neglect as defined by New York law[53] ).

248. Second, the creation of insular groups, uninterested in the larger society, is destructive to democracy. Democracy requires educated, informed and participating New York and American citizens. One important way to become educated and informed is through secular studies in elementary school and high school. For many Americans, this is the only source of their basic knowledge about how democracy and government works. Thus, it is a vital time and formative period in people's lives.

249. Hasidic children are being deprived of this, according to YAFFED and the many news stories and other articles and books cited in this complaint.[54]

250. Thus, the problem has been identified—the non-provision of a sound, liberal, secular education.

251. Yet no viable solutions are in sight—other than what is proposed in this complaint. The solution lies with the government, including the Courts (as requested here), taking immediate action to protect the Hasidic children.

252. It is time to end government official cowardice about being labeled anti-Semitic, and time to stop fearing the Hasidic Block Vote. It is time for government to uphold the right of Hasidic children to receive a sound, liberal, secular education. Only then will they be able, as adults, to exercise their individual freedom to decide what they wish to believe, and what religious groups, if any, they wish to be part of.

---

[53] *See*, N.Y.S. Education Law § 3205 and § 3212, and N.Y.S. Family Court Act § 1012 (f).

[54] A few more informative websites include: www.culteducation.com; www.footstepsorg.org; and www.jewishcouncil.org.

66

253. The Hasidic leadership is fully aware that secular education may destroy their power and control over individuals in their community. They will resist vigorously. They want an obedient flock. Yet if democracy and individual freedom is to survive in America, the welfare of the greater society, and of all citizens, must prevail over the self-serving views of any insular group. An educated citizenry is necessary for a democracy to survive. This must be regarded as a truism. The Government must insist upon this, difficult though it may be.

254. If we do not protect all our children, including Hasidic children, and give them their right to the opportunities of all Americans, and to success in life as free Americans, then shame on us.

255. Attorney General James and her State clients should join in as Plaintiffs in this litigation , and not oppose it, in the public's interest, democracy's interests, and interest of the Hasidic children being deprived of their rights as American and New York citizens.

**L. Damages to the Hasidic children—monetized**

256. It is difficult to place a monetary value on the damage done to the Hasidic population by the State of New York's failure to require an adequate liberal, secular education.

257. One measure of comparison may be to compare the family income of average Americans, or average non-Hasidic Jews, with the Hasidic population. If the disparity is, say, $40,000 per household, and there are approximately 50, 000 Hasidic households in

67

the New York, then the economic loss to the Hasidic population in New York  is **$2 billion per year!**[55]

258.  Upon information and belief, there are over 50,000 Hasidic children enrolled in yeshivas in New York City.  If each of these children could earn, on average, $55,000 with a sound, secular education, but instead earns $15,000 with the non-secular religious education, this amounts to damages as an adult that equate to $40,000, times an actuarial working life of, say, 50 years, for a lifelong economic loss per child of $2 million.

259.  A $2 million dollar loss per child, time the 52,000 children currently enrolled, equals a total anticipated loss to the <u>presently enrolled</u> New York City Hasidic population of **$104 billion dollars**, which amount will double every 12 years with the full turnover in school enrollment, and also increase exponentially with the exponential increase in student population.  This is a loss for those children after they become adults.

260.  And it is a huge cost that will be borne by the larger society in many respects, in terms of social services costs, lost tax revenues, lost productivity and, most importantly, loss human potential.  Our elected officials must act to protect the children and the larger society, even if it means losing the political support of the Hasidic leadership and the Block Vote they control.

### M. Appoint a Law Guardian for Hasidic children

261.  Because the allegations and causes of action of this complaint concern minor children, the Court should consider appointing a law guardian or law guardians to represent and safeguard the interests of the affected children, to the extent the Court deems this appropriate.

---

[55] The dollar estimates are, upon information and belief, rough but plausible estimates. Governmental statistics and additional data are needed to increase the accuracy of the estimates presented here.

68

## FIRST CAUSE OF ACTION -
## VIOLATION OF HASIDIC CHILDREN'S CIVIL RIGHTS,
## BY DENYING THEM THE EQUAL PROTECTION OF THE LAW,
## INCLUDING THE RIGHT TO A BASIC SECULAR EDUCATION,
## IN VIOLATION OF THE U.S. AND N.Y.S. CONSTITUTIONS

262.  Plaintiffs repeat and reallege each of the above paragraphs as a fully set forth here again at length.

263.  Upon information and belief, a large number, and perhaps even a majority, of the children living in the ultra-orthodox Hasidic community do not receive even a marginally adequate secular education sufficient to enable them to adequately participate or financially succeed in the larger society outside of their insular religious community.

264.  Essentially, no secular subjects are adequately taught, at either the elementary or high school level. [56]

265.  Specifically, as detailed above from the allegations set forth in the YAFFED complaint and other sources, the average Hasidic male, upon reaching the age of majority, is seriously deficient in many aspects of their education, for example, in English language skills, in history, in math, in science and in civics.

266.  Upon information and belief, the average Hasidic child would not qualify educationally for service in the military service of the state or federal government, if called upon to serve.

267.  Upon information and belief, upon reaching adulthood, Hasidic children are insufficiently versed in civics and the affairs of secular society to independently exercise their right to evaluate candidates for public office, and to vote.  Instead, upon information

---

[56] A exception to this general statement may be found in  the Bais Yaakov yeshiva elementary and high school in Borough Park, Brooklyn, according to the YAFFED report, at pages 33 and 36.

and belief, the members of the insular Hasidic community almost always vote according to the wishes of the religious sect's dictates, meaning that it is the religious sect's leadership, not the individual members, who are exercising what should be, under commonly accepted notions of American democracy, an individual right.

268. Such "block voting," upon information and belief, is a threat to American democracy, because of all American citizens were to follow suit by becoming part of "tribes," and then voting as the tribal elders dictate, republican democracy as we know it would perish.

269. The Hasidic community is obligated, as is every community in New York State, to respect neutral laws of general applicability, including laws governing the education of children. There is no "we don't learn science" or "we don't learn civics" exception to educational requirements based upon religious belief.

270. Moreover, no child or the child's lay parent is educationally qualified to dictate to educators what the child should or should not be taught, just as a patient is not qualified to tell a health care provider what medical course of action is needed to address a life-threatening medical condition. There may be many ways to educate a child, just as there may be several ways to address an illness, as long as the educational approach or the medical approach is within acceptable professional standards. Education that amounts to non-education, such as through the study of religious texts alone, or health care "treatment" by an unqualified practitioner, is not sufficient to qualify as either education or health care, regardless of the "beliefs" of the recipient. The larger society, through neutral, generally applicable laws, can provide for the competent provision of both children's education and citizens' health care.

271. Thus, to the extent that the Hasidic community presents the argument that "we can adequately educate our children," this is belied by the evidence and does not comport with neutral, generally applicable law.

272. The assertion that Hasidic children receive an adequate education is also belied by the fact that Hasidic municipalities appear to be the poorest per capita income municipalities in New York State. In other words, the current method of education is now allowing Hasidic children to become successful, self-supporting adults.

273. The State, and in particular the Attorney General of the State of New York, the Department of Education officials, and the heads of the public school systems that supposedly supervise the Hasidic schools, have the obligation to do their duty and intervene, to protect these children's rights, and to protect the larger society and the functioning of democracy.

274. Declaratory and injunctive relief is also appropriate.

275. The Joshua Doe and Janna Doe plaintiffs, to the extent they are identified as actual persons, should be awarded damages individually or, if appropriate, as part of a class.

## SECOND CAUSE OF ACTION -
## VIOLATION OF THE EQUAL PROTECTION RIGHTS OF TAXPAYERS PROXIMATELY AFFECTED BY AN EXPANDING INSULAR RELIGIOUS COMMUNITY

276. Plaintiffs repeat and reallege each of the above paragraphs as a fully set forth here again at length.

277. Plaintiff Diederich is a taxpayer in the Town of Stony Point and County of Rockland, New York. He represents himself and all other similarly situated taxpayers,

namely, taxpayers who pay real property taxes in the County of Rockland and whose municipality faces the expansion of the Hasidic community into the local municipality.

278. Plaintiff Diederich and other property owners in the Town of Stony Point, because of its close proximity to Hasidic communities in Rockland County, and because Stony Point residents pay Rockland County taxes, will suffer in many respects by the growing Hasidic population, including lost property values, increased local taxes, and lost democracy, especially if the Hasidic community's population continues to grow at an exponential (or geometric) rate, as it is doing.

279. These adverse effects will increase for all members of the class if the Hasidic community's children are not provided with a sound, liberal, secular education, as required by State law.

280. Upon information and belief, Plaintiff Diederich's property value is already being adversely affected by the threat of Hasidic community expansion into the Town of Stony Point.

281. Plaintiff Diederich has no objection to having a Hasidic family as a neighbor. His problem is the potentially orchestrated effort by the Hasidic leadership to create an religious enclave within the town, and then to attempt to change land use regulation (e.g., zoning) to allow the Town's land use character to become much different than what the present population wants, or to permit activities (such as a "religious complex") that involve much more traffic than is desired by the population, and which entail significantly increased municipal services without paying for such services (unlike a taxpaying "ratable" corporate complex, for example).

72

Case 1:19-cv-00035-BKS-CFH   Document 2   Filed 01/09/19   Page 73 of 105

282. Upon information and belief, if a religious group's leadership (e.g., Hasidic leadership) can coordinate and orchestrate its members' migration to a town such as Plaintiff's town, and in so doing force the existing town taxpayers to essentially subsidize the religious activity (e.g., providing town resident/taxpayer funded police, fire and ambulance services for religious group's yeshivas, synagogues and potential rabbinical college), and through increasing population numbers take over the governance of the town, and then amend land use controls in a manner that reduces property values, such coordinated religious group action will have the effect of denying the pre-existing town residents of the equal protection of the law, and will discriminate against them on account of their religion (i.e., being non-Hasidic).

283. Moreover, the orchestrated movement of one religious group into a community with the long range intention of taking over the town politically (or significantly influencing governmental action), amounts to a conspiracy to deprive the pre-existing community of its citizens' religious freedom, and in particular, their freedom not to have a religious group "established" in the town, by influencing or controlling local governance.  The Establishment Clause prohibits the establishment of religion.

284. Plaintiff has been damaged thereby, individually and as a member of the class of citizens that he represents.

73

### THIRD CAUSE OF ACTION -
### DEPRIVING CHILDREN THEIR RIGHT TO A SECULAR EDUCATION
### IMPERILS REPUBLICAN DEMOCRACY PROTECTED BY THE GUARANTEE
### CLAUSE OF THE U.S. CONSTITUTION

285. Plaintiffs repeat and reallege each of the above paragraphs as a fully set forth here again at length.

286. The YAFFED complaint notes the exponential growth of the Hasidic community.

287. Non-education and religious indoctrination of American children is a unique issue in American jurisprudence.

**A. The Guarantee Clause envisions an educated citizenry**

288. It is clear that the Nation's Founding Father's envisioned an educated and informed citizenry securing the Nation's republican form of government.   In fact, the Founding Father's established this bedrock principal in the Guarantee Clause of the Constitution, in Article IV, § 4, which provides that:

> "The United States shall guarantee to every State in this Union a Republican Form of Government, ..."

289. Under this provision, the U.S. Congress can certainly provide for the adequate secular education of New York's Hasidic children, if New York State fails to do so itself. Or the federal courts, as a branch of the United States government can do so, as long as it finds the matter justiciable,[57] which it should, both because of the uniqueness of the issue and also issues overlap with equal protection and Establishment Clause protections.

---

[57] The present case is quite unlike that of *Luther v. Borden*, 48 U.S. 1 (1849)(involving Dorr's Rebellion), where the Supreme Court determined that what was involved was a non-justiciable political question.

74

Case 1:19-cv-00035-BKS-CFH    Document 2    Filed 01/09/19    Page 75 of 105

290. As to the facts of this case, here the insular religious community is not allowing many of its members to intelligently participate and contribute to the larger society, and in so doing, it impairs the State's provision of republican democracy as the Founders envisioned it.

291. No democracy can survive if non-education results in an exponentially-growing segment of the population that does not adequately participate in, and contribute to, the democracy. Rather, left unsolved, this will become a time bomb.

292. For example, what if the country become involved in a war or other major catastrophe that results in the need to conscript able-bodied young citizens? If one segment of the population—for example, the Hasidic community—is unwilling or unable to provide the needed conscripts, at a minimum resentment will arise in the non-Hasidic conscripted population. The N.Y.S. Constitution requires that Young adults be sufficiently educated to be able to serve in the military, as it imposes an obligation upon citizens to be able to defend and protect the State and the Nation. *See,* N.Y.S. CONSTIT., ART. XII, § 1.

293. If the present level of education Hasidic children receive do not permit this, the N.Y.S. Constitution is being violated, and this segment of the State population, the Hasidic community, is not meeting is potential constitutional obligation.

**B. Hypothetical Vatican takeover of Kiryas Joel to form a "Roman Catholic town" –establishing religion and eliminating a republican form of govenment**

294. A hypothetical may be useful in further examine the Guarantee Clause issue, as well as the Establishment Clause.

295. What if the Vatican (or the headquarters of other organized religious group) decided to relocate itself to Orange County, and use its billions of dollars of wealth to

purchase all property in the new Town of Palm Tree (formerly Kiryas Joel) with the purpose of establishing a "Roman Catholic town" in the State of New York. Fundamental issues will arise.

296. Can the new owner (the Pope) refuse to allow Protestants and Hasidics to purchase or rent in this new town? (<u>Answer</u>: No.).

297. If the Pope replaces the yeshivas with parochial schools, can he insist that all instruction in the parochial school in given in Italian (or Latin)?  (<u>Answer</u>: it depends upon what the State of New York allows.)

298. What if the Pope requires that all school children be taught the biblical admonition "be fruitful and multiply"[58]  and encourage all females to marry young and have as many children as possible?  (<u>Answer</u>:  this can be taught as a religious matter; however, the State of New York can also require that sex education be taught, as well as secular subjects, whereby girls will learn that they have individual liberty such that they can control their own bodies and make their own decisions regarding personal autonomy and the bearing of children).

299. What if, under the Pope's influence, the community unanimously votes for school boards, planning boards and zoning boards, and health and safety enforcement officials that discriminate in favor of Roman Catholics and against all others?  (<u>Answer</u>: people have the right to vote for whomever they wish, which is why a liberally educated, informed citizenry and individual citizen decision-making is so vital.[59] )

---

[58] The Book of Genesis 1:28, available the Vatican's website: at http://www.vatican.va/archive/bible/genesis/documents/bible_genesis_en.html .

[59] President John F. Kennedy eloquently made this point when he promise that Rome would not direct his decision-making as president, and should not direct any American's civic decision-making..

76

300. And what if the elected school provides no funds for a "public school system" within this town, stating that: "We have no residents who need or want to send their children to public school." (Answer: This is a problem. If the Vatican's new community is "ultra-Orthodox" and willing to ostracize any community member to might speak out against the Pope's wishes, such as by stating a desire to have his or her children educated in a public school with a secular curriculum and after-school activities that include activities most New Yorkers would view as important to a child's growth as an individual [e.g., sports teams; music; theater; other fine arts; political, civic or other debating societies and other clubs that involve interaction with other members of New York's pluralistic society]; if a public school is not available to the town's residents they are effectively deprived of their rights as citizens through the establishment of religion in the Town of Palm Tree).

301. This hypothetical is intended to show the power of organized religion (and some limits), if the religious group wishes to exercise it.

302. The Founding Fathers, however, did not want America to become a theocracy.

**FOURTH CAUSE OF ACTION -**
**HASIDIC CHILDREN HAVE NO ABILITY TO PETITION GOVERNMENT**
**FOR REDRESS, AND THUS THE COURT SHOULD**
**ENSURE THAT THEIR INTERESTS ARE HEARD**
**(THEIR PARENTS' OR RELIGIOUS LEADERS' VIEWS**
**NOTWITHSTANDING)**

303. Plaintiffs repeat and reallege each of the above paragraphs as a fully set forth here again at length.

304. All citizens have the right to petition the government for redress, except that when it comes to minor children, such right must be exercised through others acting on their behalf.

Case 1:19-cv-00035-BKS-CFH    Document 2    Filed 01/09/19    Page 78 of 105

305. Upon information and belief, the redress that all Hasidic children should petition for is to have a sufficient education to allow them to knowingly and intelligently direct their lives and their future upon reaching adulthood, rather than to have others (the Hasidic leadership) direct their thoughts and their actions concerning their lives.

306. Minor children have no ability to seek help on their own.

307. Therefore, a law guardian should be appointed, so that they can exercise their First Amendment right to petition government for redress.

308. Alternatively, the Court can and should take judicial notice that any and all human beings, as autonomous beings, have the right to obtain sufficient knowledge from within American society for their independent, autonomous decision-making regarding their lives and their future.

### FIFTH CAUSE OF ACTION -
### HASIDIC CHILDREN ARE FORCED INTO "SEPARATE YET UNEQUAL" SCHOOLS; SUFFER "INVOLUNTARY SERVITUDE;"  ARE FORCED INTO A "HASIDIC GHETTO"; SUFFER EDUCATIONAL NEGLECT; AND SUFFER AN IMPAIRED ABILITY TO CONTRACT WITH THE LARGER AMERICAN SOCIETY, ALL IN VIOLATION OF THE 13th AND 14th AMENDMENTS AND 42 U.S.C. §§ 1981, 1983, 1985 & 1986

309. Plaintiffs repeat and reallege each of the above paragraphs as a fully set forth here again at length.

**A. Hasidic Yeshivas are "Separate and Unequal"**

310. Hasidic children are part of a "separate" insular religious community. However, they are minors and require appropriate protection by the State.

311. Their religious community's assertion that their education is "equal" to that of the public schools, even though "separate," is as constitutionally obnoxious from the

78

Case 1:19-cv-00035-BKS-CFH   Document 2   Filed 01/09/19   Page 79 of 105

children's standpoint as the "separate but equal" doctrine set forth in the *Plessy v. Furguson* decision.[60]

312.  By allowing these separate but unequal educational facilities—the Hasidic yeshivas—to exist, the Defendants are engaged in State action that denies Hasidic children their federal constitutional rights.

313.  Defendants' acts and omissions deprive the Hasidic children of the equal protection of the law, and this amounts to State action that is actionable under 42 U.S.C. § 1983.

314.  The children have been damaged thereby, and need class representation and a law guardian appointed.

**B.  The Hasidic Yeshivas amount to Involuntary Servitude in the service of religious elders**

315.  Upon information and belief, Hasidic children of often confined to yeshivas with very limited space, with less than adequate opportunity for physical and mental development, where they are forced into what amounts to involuntary servitude in the form of compelled religious indoctrination during essentially the entire day, imposed for the purpose of maintaining religious group control over their personhood.

316.  Upon information and belief, this also amounts to educational neglect by the parents and the Hasidic yeshivas, within the meaning of the N.Y.S. Family Court Act.

317.  Upon information and belief, the indoctrination, mind control, peer pressures and limitations on physical movement and non-Talmud-related activities amounts to the creation of involuntary servitude for Hasidic children in many, if not most, of the Hasidic Yeshivas.

---

[60] *See*, *Plessy v. Ferguson*, 163 U.S. 537 (1896).

318. Moreover, the Hasidic Enterprise is effectively conscripting its youth into religious service that could easily (by this or any other insular or radical religious group) be turning into a religious militia.

319. The State has the right to conscript young adults for military service (*see, Arver v. United States*, 245 U.S. 366 (1918)[61]). A non-governmental entity, including the Hasidic Enterprise, does not. Yet young Hasidics are essentially conscripted into the service of the Hasidic leadership.

320. Like indentured servants, Hasidic children and their parents have little control over many aspects of their lives, and as such are servants to the will of the Hasidic leadership.

321. The Court should recognize this, and take action to end the physical and mental servitude of the children. It should do so by requiring reasonable hours of school classroom attendance, and most importantly, the requirement of intellectual freedom, by requiring that a sound, liberal, secular education be taught.

322. The Defendants have permitted this abuse, and thus this State action is actionable under 42 U.S.C. § 1983.

---

[61] As the U.S. Supreme Court taught in *Arver*:

> "Compelled military service is neither repugnant to a free government nor in conflict with the constitutional guaranties of individual liberty. Indeed, it may not be doubted that the very conception of a just government and its duty to the citizen includes the duty of the citizen to render military service in case of need, and the right of the government to compel it."

245 U.S., at 367.

## C. Interference with Ability to Contract on Account of Race (being Jewish)

323. Courts have viewed Jews as a "race" for constitutional purposes, and for the purpose of protecting Hasidic children, the Courts should deem Hasidic children as a race for purposes of 42 U.S.C. § 1981, so that they can be protected.

324. Upon information and belief, the United States' federal courts have held Jews to be a "race" for purposes of 42 U.S.C. § 1981.

325. Because they are being intentionally inadequately educated by their Hasidic church elders, the Hasidic children are being denied the ability to contract in many respects with the outside, non-Hasidic world.

326. This is an interference with contract in violation of 42 U.S.C. § 1981.

327. The Defendants have permitted this abuse, and thus this State action is actionable under 42 U.S.C. § 1983.

## D. The Hasidic Leadership conspires to deprive Hasidic Children of their constitutional rights, and refuses aid

328. To the extent that the Hasidic elders are conspiring to deprive their community's children of civil rights, they are, upon information and belief, also be violating 42 U.S.C. §§ 1985 and 1986.

Section 1985(c)

329. Specifically, 42 U.S.C. § 1985(3) creates a cause of action where "two or more persons in any State ... conspire ... for the purpose of depriving ... any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."

81

330. This protection applies where the plaintiff can show that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action."[62]

331. Such is certainly the case here. Hasidic children are being oppressed and subjugated by the Hasidic leadership because they are Hasidic, and therefore can be controlled through purported religious directives.

332. Hasidic children are being ignored in their oppression and subjugation by the Defendant governmental officials on related grounds—political fear of the Hasidic leadership, and thus ignoring the civil rights of the Hasidic children.

333. The proof includes the Felder Amendment. The impetus of State government in enacting this Amendment was clearly purported to be the Hasidic religion. Proof of action based upon religion suffices.[63] Such proof permeates this case.

334. A § 1985(3) claim requires proof of a conspiracy between "two or more persons." A conspiracy, for these purposes, need not be shown by proof of an explicit agreement but can be established by showing that the "parties have a tacit understanding to carry out the prohibited conduct."[64]

---

[62] *See, Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971).

[63] *See, Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*, 968 F.2d 286, 291 (2d Cir.1992); *Colombrito v. Kelly*, 764 F.2d 122, 130-31 (2d Cir.1985); *see also* Remarks of Senator Edmunds during debate preceding passage of Civil Rights Act of 1871, Cong.Globe, 42d Congress, 1st Sess. 567 (1871) (if a "conspiracy was formed against [a] man ... because he was a Catholic, or because he was a Methodist ... then this section could reach it").

[64] *See, United States v. Rubin*, 844 F.2d 979, 984 (2d Cir.1988); *see also United States v. Wardy*, 777 F.2d 101, 107 (2d Cir.1985), cert. denied, 475 U.S. 1053 (1986); *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir.1990) (conspiracy may be established by showing that "participants in the conspiracy ... share the general conspiratorial objective") (*internal quotes omitted*), cert. denied, 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991).

82

335. The term "persons" for purposes of Sec. 1985(3) includes municipalities[65] and State officials.

336. A claim under § 1985(3) may be established against a state if "it is proved that the State is involved in the conspiracy or that the aim of the conspiracy is to influence the activity of the State."[66]

337. Nothing could be clearer in this case. The Hasidic leadership "conspired" with legislators for the passage of the Felder Amendment.

338. And all the Defendants here,[67] to various degrees, have all assisted and aided the Hasidic leadership in keeping their Hasidic flock under-educated and isolated from the larger body politic.

<u>Section 1986</u>

339. Section 1986 of U.S.C. Title 42 states in relevant part:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; ...."

340. The governmental defendant have, in various degrees, conspired with the Hasidic leadership to deprive Hasidic children of their education rights and other civil rights, and have failed to prevent the unlawful oppression of these children, despite having the power to do so, whether intentionally or by neglect.

---

[65] *See, Owens v. Haas*, 601 F.2d 1242, 1247 (2d Cir.), cert. denied, 444 U.S. 980 (1979),

[66] *See, United Brotherhood of Carpenters & Joiners of America, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 830, 103 S.Ct. 3352, 3357, 77 L.Ed.2d 1049 (1983).

[67] Presumably even AG-Elect Letitia James, in her prior role as NYC Public Advocate.

83

341. The Plaintiffs Joshua and Jana Doe, individually and as representatives of a class, have been damaged thereby.

**E. Educational Neglect—also in violation of the children's equal protection, religious freedom and other federal rights**

347. By failing to provide an adequate secular education, both the parents of the Hasidic children, and the Hasidic yeshivas, are guilty of educational neglect[68] within the meaning of New York State law.   *See also*, Eighth Cause of Action, *infra*.

348. Specifically, Section 1012 (f) the N.Y.S. Family Court Act ("FCA") identifies a "neglected" child as a child less than eighteen years of age:

> "(i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care in supplying the child with adequate … food, clothing, shelter or education in accordance with the provisions of part one of article sixty-five of the education law…."

349. Yeshiva officials, as persons "legally responsible for a child,"[69] can also be charged with violating the FCA.  The Defendants should consider filing, or causing the filing of, neglect petitions in this regard, to be prosecuted by the County Attorney's office.

350. Respectfully, when a boy or girl raised in New York State who is entering high school cannot comprehend English, and does not have knowledge of basic secular topics that any public school child should know, that should be deemed *per se* evidence (or at least *prima facie* evidence) of an impairment or imminent danger of becoming impaired sufficient to support a charge of educational neglect.

---

[68] *See*, N.Y.S. Education Law § 3205 and § 3212, and N.Y.S. Family Court Act § 1012 (f).

[69] *See*, FCA §1012(a & g)

351.  Mandatory reporting should be done under N.Y.S. Social Services Law § 419 (or face civil liability or criminal liability under SSL § 420).

352.  The Defendants have permitted this abuse, and thus this State action is actionable under 42 U.S.C. § 1983.

### SIXTH CAUSE OF ACTION –
### THE N.Y.S. DOE'S NEW GUIDANCE DEPRIVES CURRENT HASIDIC CHILDREN OF THEIR RIGHT TO A BASIC EDUCATION

353.  Plaintiffs repeat and reallege each of the above paragraphs as a fully set forth here again at length.

354.  The new N.Y.S. DoE guidance is, and will continue to be, ineffectual in helping <u>today's</u> Hasidic student obtain the necessary liberal, secular education to succeed and thrive in the modern world.

355.  Instead, the DoE guidance pushes off any meaningful corrective action until after the next gubernatorial election, in 4 years.

356.  Moreover, the DoE guidance involves such an entanglement between Church and State that if the State ever sought to take enforcement action against a Hasidic yeshiva for not adequately educating the children in its care, such litigation would involve years and years of further delay.

357.  The Court must act <u>now</u> to help the Hasidic children, as the new N.Y.S. DoE guidance will do nothing at all in the reasonably foreseeable future nor, as written, in our lifetimes.

358.  The Court should declare the new N.Y.S. DoE guidance to be and unconstitutionally insufficient response to the violations of Hasidic children's rights described in this complaint.

85

## SEVENTH CAUSE OF ACTION -
## GHETTOS ARE ANTI-AMERICAN,
## AND THEIR CREATION VIOLATES THE ESTABLISHMENT CLAUSE

359. Plaintiffs repeat and reallege each of the above paragraphs as a fully set forth here again at length.

360. Whether designed by the majority race or culture or the minority race or culture, ghettos are un-American and violate the principles upon which the United States of America was founded.

361. Intentional under-education of any group of Americans that prevents their integration into American society is also un-American. This, combined with religious indoctrination and cultural insularity, will tend to create enclaves—and what may be viewed as ghettos.

362. The Hasidic leadership is intentionally creating its Hasidic ghettos (and this term is not meant in a derogatory sense, but only descriptively[70]) for the purpose of imposing religious rule over the Hasidic community's members.

363. The Hasidic leadership does so coercively—to ostracize and punish anyone who is non-compliant or who dissents.

364. Upon information and belief, this conduct involves the impermissible establishment of religion.

---

[70] Merriam Webster's definition of *ghetto:*

1: a quarter of a city in which Jews were formerly required to live

2: a quarter of a city in which members of a minority group live especially because of social, legal, or economic pressure

3a: an isolated group a geriatric *ghetto*

  b: a situation that resembles a ghetto especially in conferring inferior status or limiting opportunity.

*See*, https://www.merriam-webster.com/dictionary/ghetto .

86

Case 1:19-cv-00035-BKS-CFH    Document 2    Filed 01/09/19    Page 87 of 105

365.  The Founding Fathers designed the Establishment Clause "to insure that no one powerful sect or combination of sects could use political or governmental power to punish dissenters." *See*, *Zorach v. Clauson*, 343 U. S. 306, 319 (1952) (Black, J., dissenting).

366.  As Justice Hugo Black explained in 1952 in *Zorach*:

> "It was precisely because Eighteenth Century Americans were a religious people divided into many fighting sects that we were given the constitutional mandate to keep Church and State completely separate. Colonial history had already shown that, here as elsewhere, zealous sectarians entrusted with governmental power to further their causes would sometimes torture, maim and kill those they branded 'heretics,' 'atheists' or 'agnostics.' The First Amendment was therefore to insure that no one powerful sect or combination of sects could use political or governmental power to punish dissenters whom they could not convert to their faith. Now, as then, it is only by wholly isolating the state from the religious sphere and compelling it to be completely neutral, that the freedom of each and every denomination and of all nonbelievers can be maintained."
> *Id.*, 343 U.S. at 318-19.

367.  Although Justice Black was in the dissent in *Zorach*, there is nothing in that decision to indicate that any of the Justices of that Supreme Court would approve of State-condoned religious indoctrination of children, in lieu of compulsory education in civics and other secular subjects.[71]

368.  New York is presently allowing the creation of insular religious enclaves in the State, where the children are only taught what the religious elders allow to be taught. This is as astonishing as it is legally offensive, because it is creating religious government

---

[71] *See also*,  *Everson v. Board of Education,* 330 U. S. 1 *(1947)(*reimbursement of transportation costs to all schools, including parochial school, is constitutionally permissible); *McCollum v. Board of Education,* 333 U. S. 203 (1948)(religious instruction in public schools impermissible); *cf.*, N.Y.S. Constit, art. XI § 3 (No "… public money… to be used, directly or indirectly, in aid or maintenance, of than for examination or inspection, of any school … under the control or direction of any religious denomination … [other than] for transportation of children….").

in a State and Nation founded on the principle that matters of religion and civic affairs must be kept separate, for the democracy to work.

369. Allowing children some time to study religion, or to obtain a State-required secular education in a Church-run parochial school or yeshiva, is quite different than allowing a religious sect to compels its members students to study only (or principally) religion.  Permitting such religious dominance –indoctrination—in the education of children not only promotes religion, but establishes it.

370. The Hasidic ghettos of KJ (Palm Tree), New Square, Kaser, Williamsburg, Crown Heights , Borough Park and Lakewood (NJ) are examples— indeed, exemplars—of intentionally created *de facto* religious governments established within the larger civil society.

371. This is impermissible in the State of New York and the United States of America.

372.  What is needed, to protect the children, individual freedom, and our democracy is a society where all children receive a sound, liberal, secular education (with any additional religious instruction given separately,[72] such as after the regular school day).

373. Defendants action, in fostering the creation and expansion of Hasidic ghettos in New York State by aiding and abetting the non-provision of adequate secular

---

[72] Blending religious and secular instruction is problematic.  State or local education officials will have difficulty determining whether the instruction is adequate.  Church will not be sufficiently separated from State.  The Catholic parochial  school or Hasidic yeshiva could begin every biology case with the instruction:  "Our sacred texts inform us that evolution does not exist, but I must "teach" you  about evolution, so let me explain its lies…"  Or every civics and history class with an instruction that their religious group are the "chosen people," and therefore should to the extent possible remain isolated from the outside world.

education for Hasidic youth, has damaged the named Plaintiffs, both individually and as representatives of their respective classes.

374.  Plaintiff have been damaged thereby

### EIGHTH CAUSE OF ACTION - HASIDIC CHILDREN ARE THE VICTIMS OF EDUCATIONAL NEGLECT, WHICH NEGLECT THE DEFENDANTS MUST RECTIFY

375.  Plaintiffs repeat and reallege each of the above paragraphs as a fully set forth here again at length.

376.  Because the children of Hasidic parents are not receiving a sufficient education, the parents are guilty of education neglect (which is also the fault of their religious elders, who upon information and belief dominate Hasidic life).

377.  Educational neglect can be prosecuted in Family Court.  *See*, ¶¶ 347 – 351, *supra*.

378.  This Court should enjoin Defendants to be mandatory reporters, and to seek appropriate enforcement against Hasidic parents and Hasidic yeshiva officials for educational neglect.

379.  Plaintiff's Joshua and Janna Doe have been damaged thereby, as individuals and as members of a class of similarly situated children.

380.  Class action relief is appropriate.

### NINTH CAUSE OF ACTION - DECLARATION AND INJUNCTIVE RELIEF THAT AG-ELECT JAMES AND THE OTHER DEFENDANTS TAKE APPROPRIATE MEASURES TO PROTECT THE EDUCATIONAL RIGHTS OF THE CHILDREN OF ULTRA-ORTHODOX (HASIDIC) PARENTS

381.  Plaintiffs repeat and reallege each of the above paragraphs as a fully set forth here again at length.

89

### A. Hasidic Children have the right to a Sound Secular Education

382. The N.Y.S. Education Law requires that private schools in the state, including "religious" schools, provide a secular education "substantially equivalent" to the instruction received in the public schools of the geographical area.

383. Upon information and belief, the Hasidic children who attend most yeshivas run by the Ultra-Orthodox Hasidic sect do not receive a sound secular education, nor an education even approaching what is given in the public schools, nor one that is necessary to fulfill the obligations and responsibilities of citizenship in the larger community and State.

384. Plaintiff requests the Court to direct Attorney General-Elect James and the other Defendants to take all appropriate and necessary action to compel local superintendent of school, and the private schools (yeshivas) to provide the children with a sound secular education, and one sufficient to educationally qualify the students, by age 18, to serve in the U.S. military or N.Y.S. militia if called upon to do so in time of need.

385. These civic obligations should apply to all citizens, regardless of their religion[73] or cultural identity.

386. The children, and the larger body politic, are injured when children are not sufficiently educated to be informed citizens capable of undertaking civic activities and the military defense of the State and Nation.

---

[73] As to *bona fide* conscientious objectors, the 18 year old should be qualified for alternative civic duties in a State or national crisis, for example, serving as medical personnel.

90

**B. "Hasidic Children's Lives Matter"—their education, their quality of life, their participation in the larger civil society and body politic, and their safety.**

387. Just as government officials should not discriminate against Afro-American because of the color of their skin, government officials should not discriminate against Hasidic children, by denying them the rights and opportunities that all Americans are entitled to enjoy, based upon their parents' membership in an insular religious sect that is fearful of the outside world and that disdains many of the values and principles that the Nation's Founding Fathers imbedded in the Nation's system of reason-based, pluralistic governance.

388. "Hasidic lives matter!"  Every Hasidic child has the right to achieve his or her personal potential, and to be protected by the laws and constitution s of the State of New York and the Nation.   Hasidic parents, and narrow-minded religious leaders residing in the 18th Century have no right to deprive any child of the rights he or she possesses as a U.S.-born citizen.  Nor do they have the right to oppress or indoctrinate their children, or to perpetrate educational neglect.  They have rights, but not absolute rights.  The children are not chattel.

**C. The UN's Universal Declaration of Human Rights applies**

389. The Universal Declaration of Human Rights ("Declaration"), issued by the UN on December 10, 1948, and drafted by representatives with different legal and cultural backgrounds from all regions of the world, proclaims, among other things, that the Declaration is a:

> "common standard of achievement for all peoples and all nations, to the end that every individual and every organ of society, keeping this Declaration constantly in mind, shall strive by teaching and education to promote respect for these rights and freedoms and by progressive measures, national and international, to secure their universal and effective

91

recognition and observance…."

and, at Article 26,  that:

> "(1) Everyone has the right to education. Education shall be free, at least in the elementary and fundamental stages. Elementary education shall be compulsory. Technical and professional education shall be made generally available and higher education shall be equally accessible to all on the basis of merit.
> (2) <u>Education shall be directed to the full development of the human personality and to the strengthening of respect for human rights and fundamental freedoms. It shall promote understanding, tolerance and friendship among all nations, racial or religious groups</u>, and shall further the activities of the United Nations for the maintenance of peace." (*emphasis added*)

390.  Upon information and belief, the only type of education that is directed to the full development of the human personality, respecting human rights and fundamental freedoms, and promoting tolerance and friendship is a sound, liberal, secular education.[74]

391.  In sum, if our State and Nation values all children, including Hasidic children, then its Courts must act to protect them, by allowing them an adequate education.  It is the children's right as citizens and as human beings.  The Court should declare the children's rights to a sound education, and enjoin the Defendant governmental officials to act.

392.  If necessary, the Court can permissibly view some or all of the relief requested in this complaint as a petition under CPLR Article 78.

393.  Plaintiffs request this declaratory and injunctive relief.

---

[74] This is not to deny the religious teachings of the World's major churches today—for example the Roman Catholic Church, Protestant Churches, and Islam--are much more liberal and tolerant today than was often the case in the past.

92

### TENTH CAUSE OF ACTION -
### REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF THAT THE PUBLIC SCHOOL SYSTEM DEFENDANTS PROTECT THE EDUCATIONAL RIGHTS OF THE CHILDREN OF HASIDIC PARENTS IN KINGS, ROCKLAND AND ORANGE COUNTIES

394.  Plaintiffs repeat and reallege each of the above paragraphs as a fully set forth here again at length.

395.  The Defendant N.Y.C. Schools Chancellor, the NYC Mayor, and two other Defendant Superintendent of Schools, have a legal duty under the N.Y.S. Education Law and N.Y.S. Constitution to protect children's educational needs, and to guarantee them a sound secular education, substantially equivalent to that given in the public schools, so that these children can be educated, productive citizens upon reaching the age of majority.

396.  Upon information and belief, the Defendant school heads are failing in this duty.

397.  Plaintiff requests that the Court direct the Defendant school heads to take appropriate action to protect the educational rights of Hasidic children.

398.  Plaintiff requests that this Court allow one or more real children to be substituted for the fictitious "Doe" plaintiffs named in the caption.  This will likely only occur if one or more Hasidic parents are brave enough to stand up against their insular religious sect in support of a better secular education for their children in the Hasidic yeshivas.

"PTA-Evaluator" Proposal

399.  One possible means of achieving the desired result of a better secular education for Hasidic children is Hasidic self-help, with one idea being as follows:

93

a. Each Yeshiva establishes, if it has not already, a Parent-Teacher type association ("PTA");

b. The PTA works with the Yeshiva administration to establish periods of exclusively secular education;

c. The Yeshiva agrees to regular, unannounced visits by an impartial evaluator, with background in secular education, who evaluates the secular instruction, and makes recommendations (one possible recommendation of which is that the children are being educationally neglected).

d. The PTA funds the evaluator, and provides the evaluator with direction, which direction must include the direction that the evaluator examine whether the pre-agreed secular subjects are being taught effectively and in good faith.

e. The PTA agrees that religious doctrine will not trump secular instruction, but rather, that secular instruction is viewed as distinct from religious instruction, with the two taking place at different times during the school day.

400. The purpose of the above is to provide for adequate secular education. It might be modeled after the Roman Catholic parochial schools (which are open to all faiths), where the school day consists of secular instruction except that one class period is devoted to religious instruction. Upon information and belief, religiously themed private schools do likewise. The goal is an adequate secular education.

401. Plaintiffs requests that the Court grant this declaratory and injunctive relief.

94

## ELEVENTH THIRTEENTH CAUSE OF ACTION -
## REQUEST FOR DECLARATORY AND INJUNCTIVE ACTION AGAINST THE DEFENDANT STATE OFFICIALS, REQUIRING THAT THEY INVESTIGATE WHETHER THE HASIDIC LEADERSHIP IS ENGAGED IN A CORRUPT ENTERPRISE, IN VIOLATION OF RICO—
## THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## 18 U.S.C. 1961 *et seq*

402.  Plaintiffs repeat and reallege each of the above paragraphs as a fully set forth here again at length.

403.  Upon information and belief, the Hasidic community is governed by a male hierarchy (purportedly religious) whose actions, in many respects, are for the purpose of corruptly enriching themselves and affiliated persons (hereinafter "Hasidic Enterprise") under the guise of being an "ultra-orthodox" religious group.

404.  Upon information and belief, the Hasidic Enterprise, especially the top "religious" leaders of the Hasidic community, is a corrupt enterprise within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968.

405.  Upon information and belief, the vast majority of the Hasidic religious community's members genuinely believe that their religious leader's motivations are based upon devout "ultra-orthodox" religion belief, rather than on any corrupt secular purposes.

406.  Plaintiff Diederich believes that the vast majority of Hasidic Jews are moral, devout, religious and well-intentioned individuals who strongly believe in their religious books, principles and customs.

407.  However, upon information and belief, the true motives of the Hasidic community's religious leadership is power, subjugation of its members, indoctrination of

95

Hasidic children, and expansion of the Hasidic Enterprise, all for personal gain, power and enrichment.

408.  Upon information and belief, the Hasidic communities at issue appear to have more of the characteristics of a radical sect than of an Old Testament-based Jewish church.  The Old Testament-based Jewish churches, such as that of Reform, Conservative or Orthodox Judaism use religion, in substantial part, as a spiritual guide for leading a good, moral life, surviving in the 21st Century world, and living peacefully and productively in a pluralistic American society.  The Hasidic community, in contrast, seeks isolation and insularity and a purportedly ancient (but actually non-existent) lifestyle.

409.  Upon information and belief, it appears that the Hasidic leadership (the Hasidic Enterprise), under the guise of religion, directs or assists others in engaging in RICO predicate acts in order to advance the unlawful goals of what can be fairly characterized, at the leadership level, as a criminal organization and enterprise.

410.  The Court must take note that a RICO enterprise does not need an economic motive and that a religious group can therefore qualify as a RICO enterprise.[75]

411.  Specifically, upon information and belief, the Hasidic Enterprise's leadership undertakes the following RICO-violative predicate acts:

a.  Directs the members of the Hasidic community to conform to the leadership's demands in many areas of personal life, including directing the membership to disregard, ignore or violate various civil laws (including RICO predicate acts) when this can benefit the Enterprise's purposes.

---

[75] *See, e.g., National Organization for Women v. Scheidler*, 510 U.S. 249 (1994).

96

b. Directs its members' children to attend, and thus the members to pay for, Hasidic Enterprise-controlled "religious schools" (Hasidic yeshivas), rather than any other non-Hasidic yeshiva or the public schools. If a Hasidic member violates this Hasidic Enterprise directive, the member faces community ostracism[76] and even threats of physical, economic or informational (blackmail) harm, and faces similar threat toward his or her family members. This amounts to extortion—obtaining Hasidic parents' non-consensual funding of Hasidic yeshivas under threat of social ostracism and even violence—in violation of the federal Hobbs Act, 18 U.S.C. § 1951.

c. Directs Hasidic Enterprise-controlled Hasidic yeshivas to violate the N.Y.S. Education Law, violate 42 U.S.C. § 1981, 1985 and 1986, and violate the equal protection clauses of the N.Y.S. and federal constitutions, by failing to provide a sufficient secular education for students enrolled in the Hasidic yeshivas.

d. Depriving Hasidic children of a sound secular education for the purpose of maintaining Hasidic Enterprise control over these children once they reach the age of majority, and maintaining control over the Hasidic children's parents and related family, and doing so in a coercive and extortionate manner.

e. After intentionally depriving Hasidic children of adequate tool for self-sufficiency when they reach majority, the Hasidic Enterprise then directs (or at least aids—and has for a period of over 10 years) its young adults to perpetrate various illegal acts constituting RICO predicate acts, including but not limited to:

---

[76] As reported in the Rockland Journal News:

> "Several insiders added that New Square authorities prevent parents from carrying on peacefully in the nearby ultra-Orthodox enclave of Monsey, a common destination for those who do leave. Among their tactics: New Square authorities call Hasidic yeshivas in Monsey and tell them not to accept children of families who have left.
> As one insider put it, "You lose your family, lose everything, likely your wife and kids, all friends you've ever known."

*See*, Journal News story *"Tech ban for New Square school kids, parents*," published August 17, 2016 and available online at: https://www.lohud.com/story/news/investigations/2015/11/05/new-square-rules/74471378/.

97

i. using the U.S. mail to fraudulently apply for Medicaid benefits:

ii. using the U.S. mail to fraudulently apply for food stamps and other welfare benefits:

iii. using the U.S. mail to fraudulently apply for Section 8 housing;

iv. filing tax returns that fraudulently claim college education tuition credits and deductions for which the Hasidic applicant is unqualified because the education received is religious thus not qualifying for such credit or deduction;

v. using the U.S. mail to fraudulently file tax forms and other applications for governmental benefits where the applicant indicates that she is "single" and without the financial support of a husband, when in fact she is married within the Hasidic faith and where the husband is available and able to provide support for the children: and

vi. using the U.S. mail to fraudulently file paperwork falsely certifying that the Hasidic yeshiva is compliant with various Federal, State, County and local health, safety and fire code rules and regulations.

f. Accepted a portion of the proceeds of a $30 million fraud perpetrated upon the federal government, and after "block voting" for Hilary Clinton in 2000, obtained President Bill Clinton's commutation of the long federal prison sentences that the New Square perpetrators were serving, at the request of the New Square Hasidic community (and arguably a political *quid pro quo* for the block vote).[77]

g. Accepted, directly or indirectly, tens of millions of dollars for New Square officials and residents, obtained by defrauding taxpayer in connection with "Judaic studies" at Rockland Community College and thefts from federal anti-poverty programs, in the 1990's (three New Square men and one Brooklyn man

---

[77] *See*, Wikipedia , New Square, available at:
https://en.wikipedia.org/wiki/New_Square,_New_York

was convicted).[78] President Clinton also commuted their sentences, presumably based upon "political" considerations. *Id.*

h. Accepting a large dollar amount of federal internet education technology funds for yeshivas, even though Hasidic children are prohibited access to the internet.[79]

i. Engaging in litigation—essentially SLAPP suits [80] —designed to extort local communities into changing neutral, non-discriminatory land use regulations for the purpose of facilitating the expansion of the Hasidic Enterprise beyond its present geographical boundaries. (E.g., Village of Pomona litigation; Village of Airmont litigation.)

j. "Buying off" politicians, with the carrot or stick of the Block Vote, or by other means such as actual bribery;

k. Engaging in voter fraud;

l. Attempting to intimidate witnesses, such as four Satmar Hasidics sending photos to the internet via Twitter of a sexual abuse victim on the witness stand,[81] and physically assaulting Hasidics (e.g., assaulting a rabbi with beach

---

[78] *See* Rockland Journal News story "*1990s Judaic studies scandal also rocked Orthodox community, March 18, 2016, available online at:* https://www.lohud.com/story/news/local/rockland/ramapo/2016/03/17/1990s-judaic-studies-scandal-also-rocked-orthodox-community/81905902/

[79] *See* Rockland Journal News story "*FBI raids in Ramapo target yeshivas, tech businesses, March 17, 2016, available online at:*https://www.lohud.com/story/news/local/rockland/2016/03/16/yeshiva-technology-records-raid/81808252/

[80] A strategic lawsuit against public participation ("SLAPP") intended to censor, intimidate, and silence critics by burdening them with the cost of a legal defense until they abandon their criticism or opposition. This version appears to involve local residents seeking land use protections from Hasidic overdevelopment, and then finding their municipality facing a Hasidic SLAPP suit alleging religious discrimination and a purported violation of RLUIPA.

[81] *See*, DNAInfo news story, Bode & Sharp, *Orthodox Counselor Convicted of Sexually Abusing 12-Year-Old Girl* (Dec. 10, 2012), available online at:

https://www.dnainfo.com/new-york/20121210/williamsburg/orthodox-counselor-convicted-of-sexually-assaulting-12-year-old-girl

99

tossed in his face) who attempt to stop sex abuse or other abuse, mistreatment or neglect of children in the Hasidic community/yeshivas.[82]

412. Upon information and belief, various political officials at the State and local levels of New York State government, including some or all of the Defendants herein, aid and abet the Hasidic leadership in its corrupt enterprise. (They must cease and desist in their politically motivated aid to the Hasidic Enterprise—as requested by this lawsuit.)

413. For example, to the extent that the named Defendants' herein solicit (or accept) Hasidic Enterprise-directed Block Votes and other political favor or political support for their jobs in exchange for "looking the other way" regarding the operation of the corrupt Hasidic enterprise, they are proper defendants for civil liability under RICO.

**Plaintiffs Joshua and Janna Doe's class representation under RICO**

414. The Hasidic Enterprise has directly injured Joshua and Janna Doe, and the class of children whom they represent.

415. They have been damaged thereby, as has their class.

**Plaintiff Diederich's class representation under RICO**

416. The Hasidic Enterprise has directly injured Plaintiff Diederich, through increased local taxes and loss in property value (and the threat thereof), and increased State taxes.

417. Plaintiff Diederich been damaged thereby, as has his representative class.

---

[82] *See*, DNAInfo news story, Sonja Sharp, *Man Arrested for Attacking Rabbi Who Spoke Out Against Abuse, Police Say (*Dec. 10, 2012), available online at:https://www.dnainfo.com/new-york/20121212/williamsburg/outspoken-rabbi-recovering-after-alleged-attack-williamsburg/

## TWELFTH CAUSE OF ACTION -
## "REVERSE DISCRIMINATION" AGAINST NON-HASIDICS

418. Plaintiffs repeat and reallege each of the above paragraphs as a fully set forth here again at length.

419. In many of the legal disputes identified above, such as under RLUIPA, government action that defers to the Hasidic challengers is simultaneously action which prejudices the remainder of the non-Hasidic community. This amounts, in many cases, to religious discrimination against the non-Hasidic community on account of their religion (i.e., not being Hasidic).

420. For example, as to the Rabbinical College proposal in the Village of Pomona described above, the non-Hasidic citizens of the Village of Pomona are denied their right to democratic decision-making about land use density and use if the village is forced to yield to a religious group's insistence upon their desired land use, a high density rabbinical college. Thus, if the courts force a high density land use demanded by a religious group (here, Hasidic), over the objections of the majority of the residents (non-Hasidic) who wish a low density, semi-rural or rustic living environment, this amounts to governmental action that favors one religious group against another, in violation of the Equal Protection clause[83] and the Establishment Clause.

421. This problem is not limited to RLUIPA. To the extent that governmental officials are afraid to recover funds from Hasidic criminals, such as with the four New

---

[83] As stated in *Kiryas Joel Alliance, supra, citing Knight v. Conn. Dep't of Pub. Health*, 17 F.3d 156, 166 (2d Cir. 2001):

> "To state a religion-based claim under the Equal Protection Clause, plaintiffs must plausibly allege that a government actor intentionally discriminated against them on the basis of their religion."

101

Square residents' frauds upon Rockland Community College and the federal government, or in cases of Medicaid, food stamp or Section 8 housing fraud by Hasidics, the non-Hasidic taxpaying public bear the brunt of the financial loss. This essentially imposes an extra tax upon non-Hasidics, in violation of the equal protection and establishment clauses of the state and federal constitutions.

422. Educational neglect is another example of reverse religious discrimination, where Hasidic children are allowed clearly inadequate instruction under State law, and the parents are not charged with educational neglect under the N.Y.S. Family Court Act, whereas similarly situated non-Hasidics whose children are similarly uneducated in secular subjects, upon information and belief, are subject to neglect proceedings in the N.Y.S. family court.

423. Real property taxation could be another example. Let's say a new municipality arises whose population is half Hasidic and half non-Hasidic. Let's hypothesize that "religious liberty" advocates convince government to exempt from real property taxation the portions of personal residences used for prayer and religious instruction (just as New York presently provides a real property tax exemption for religious institutions). Let's further hypothesize that in a future version of the Village of Pomona, the Rabbinical College with student housing is in place (but not paying property taxes) and that half the residential homes in the village are Hasidic, and that as to the Hasidic-owned homes, the homeowners claim that 75% of the residence is used for "religious purposes" (based upon well documented extreme religious devotion).[84] What

---

[84] Tax exemptions are merely one means of paying less in property taxes. This hypothetical is intended to demonstrate the point that an organized religious group is capable of disadvantaging people outside the religious group using instruments of government, and that this can result in the people outside the religious group being denied the equal protection of the law.

this then means is that the non-Hasidic homeowners in the village will pay perhaps four times more in village taxes for municipal services than the Hasidic residents. This can properly be viewed as reverse religious discrimination (with an economic burden that will drive the non-Hasidics out of the village, resulting in the creation of another Hasidic-controlled local government in New York State). It thus deprives the non-Hasidic residents of equal protection under the law, and of the protection of the Establishment Clause.

424. Accordingly, Plaintiffs seek a declaration that the Defendant governmental actors not take action that favors one religious group (Hasidics) over another religious grouping (all non-Hasidics).

425. If Hasidic children were to receive a sound, liberal, secular education, upon information and belief, upon becoming adults they would be better citizens, and more interested in the welfare of the larger society. They would act in a less "tribal" manner, or better yet, view their "tribe" as the State of New York or the Nation, with the likely result being the reduction or elimination of reverse religious discrimination.

### THIRTEENTH CAUSE OF ACTION -
### DECLARATION AND INJUNCTION PROHIBITING N.Y.S. COMPTROLLER FROM DISBURSING STATE FUNDS FOR UNLAWFUL PURPOSES, NAMELY, THE FUNDING OF UNLAWFUL HASIDIC YESHIVAS

426. Plaintiffs repeat and reallege each of the above paragraphs as a fully set forth here again at length.

427. Upon information and belief, the Hasidic Yeshivas do not provide an adequate, State-mandated education to the Hasidic children in attendance, and deprive these students of their statutory and constitutional rights.

Case 1:19-cv-00035-BKS-CFH    Document 2    Filed 01/09/19    Page 104 of 105

428. Upon information and belief, it is unlawful for the N.Y.S. Comptroller to disburse funds in support of yeshivas that do not comply with the education law so as to qualify for funding.

429. Upon information and belief, it is unlawful for the N.Y.S. Comptroller to disburse funds in support of yeshivas which mistreat and educationally neglect their students, and which violate the students State and federal constitutional rights..

430. This Court should therefore declare that N.Y.S. Comptroller Thomas P. DiNapoli is not authorized to disburse funds to Hasidic Yeshivas, absent a clear demonstration that such Yeshivas are in compliance with applicable law.

431. This Court should enjoin N.Y.S. Comptroller DiNapoli from disbursing funds to unauthorized Hasidic Yeshivas.

432. By disbursing funds in the past to unauthorized yeshivas, in violation of the federal and state constitution and statutes, and continuing to do so, Plaintiff has suffered economic damage and thus has standing to bring this lawsuit under N.Y.S. Finance Law §123-a.

## FOURTEENTH CAUSE OF ACTION -
## REQUEST FOR INTERVENTION BY AG-ELECT JAMES

433. Plaintiffs repeat and reallege each of the above paragraphs as a fully set forth here again at length.

434. Attorney General-elect James and her staff are legal experts in this field.

435. Thus, as a "neutral," she should closely examine this issue and, if she finds that the law and the weight of the evidence are on Plaintiffs' side (as she should), she should agree to become a co-Plaintiff in this case (and Plaintiffs will stipulate to her dismissal as a Defendant).

104

Case 1:19-cv-00035-BKS-CFH    Document 2    Filed 01/09/19    Page 105 of 105

436. Plaintiff requests AG-elect James' intervention.

## CONCLUSION

WHEREFORE, Plaintiff Diederich requests that the Court grant class action,

damages, declaratory and injunctive relief:

a. Compelling AG-Elect James to take action to protect the educational rights of Hasidic children;

b. Compelling the N.Y.S. Education Commissioner and Regents Chancellor to take action to protect the educational rights of Hasidic children;

c. Compelling the local government Defendants to likewise take action to protect the educational rights of Hasidic children;

d. allowing AG  James to intervene in this action as a co-Plaintiff

e. granting Plaintiffs declaratory and injunctive relief,

f. granting Plaintiffs damages;

g. deeming this complaint to be a hybrid action/Article 78 proceeding if necessary,

h. allowing this action to proceed as a class action, including certifying the class or classes,

i. allowing the award of attorney's fees, costs and expenses, and

j. granting such other and further relief as this Court deems just and equitable.

Dated: Stony Point, New York
       December 11, 2018

/ S/
MICHAEL DIEDERICH, JR.
*Plaintiff Pro Se & for the "Doe" Plaintiffs, and the Classes*
Diederich Law Office
361 Route 210
Stony Point NY  10980
(845) 942-0795  Mike@DiederichLaw.com

105